(C. D. 1579)

C. J. Tower & Sons *v.* United States

United States Customs Court, First Division

(Decided January 26, 1954)

*Harley J. McNeal* for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*William J. Vitale,* special attorney), for the defendant.

Before OLIVER and MOLLISON, Judges

MOLLISON, Judge: The merchandise the subject of the above-entitled protests, which were consolidated for trial and disposition, is described on the invoices as "box shooks," and was assessed with duty at the rate of 33⅓ per centum ad valorem under the provision in paragraph 412 of the Tariff Act of 1930 for "manufactures of wood * * * not specially provided for."

As originally filed, each of the protests claimed the merchandise to be dutiable at the rate of 7½ per centum ad valorem under the provision in paragraph 407 of the said act, as modified by the Mexican Trade Agreement, T. D. 50797, for "packing-box shooks, of wood, not specially provided for," or, alternatively, at the rate of 20 per centum ad valorem under the nonenumerated manufactured articles provision in paragraph 1558.

Neither of these claims was abandoned by the plaintiff, but by amendment of the protests a claim for free entry under the provision in paragraph 1604 of the said act for "all other agricultural implements of any kind or description, not specially provided for" was added to the protests, and is the claim chiefly relied upon.

The facts are not in dispute, and the evidence shows that the imported merchandise consists of certain shallow wooden boxes without tops imported in knocked-down condition. They are of two sizes, 20″ x 8″ x 5½″ and 24″ x 12″ x 6″. The evidence also shows that the only use to which the boxes are put is for harvesting of fruit crops from the fields and orchards of farms and delivering the fruit

to the premises of the canners or processors. The boxes are constantly re-used.

It appears that the boxes when assembled are particularly designed and suitable for the above-mentioned purpose for the reasons that they are of a size that one man can handle conveniently when filled and the shallowness and lack of tops prevent the fruit from being crushed. For these reasons, the boxes are universally used in the fruit-growing areas of the United States and have become standardized so that farm trucks and the unloading facilities of processing plants have been designed specifically to accommodate such boxes, and this situation has obtained for more than 30 years, according to the testimony of witnesses. It appears that the boxes are normally owned by the canner or processor, who supplies them to farmers at harvest time to the extent of the anticipated harvest. There is no dispute that they are not used in the processing of the fruit, but merely to harvest and deliver the fruit to the processor.

From the briefs filed on behalf of the parties, it is clear that there is no dispute that the term "agricultural implements," as used in paragraph 1604, *supra*, is a designation by use (*United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395); that the word "implements," as used therein, includes containers used in agricultural functions (*Wilbur-Ellis Co.* v. *United States*, 26 C. C. P. A. (Customs) 403, C. A. D. 47); and that the classification of merchandise as an agricultural implement is dependent upon the chief use of such merchandise (*United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835).

In the brief filed on behalf of the plaintiff, its counsel has referred to the definition of the noun "agriculture," as found in Webster's New International Dictionary. In the second edition of that work, 1945, the said definition reads as follows:

> The art or science of cultivating the ground, and raising *and harvesting crops*, often including also feeding, breeding, and management of livestock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, *including* to a variable extent the preparation of these products for man's use and *their disposal by marketing or otherwise*. In this broad use it includes farming, horticulture, forestry, dairying, sugar making, etc. [Italics added.]

Citing the foregoing definition, and the facts and law above set out, it is the plaintiff's contention that a *prima facie* case indicating that the importations are agricultural implements used in connection with agricultural pursuits has been established.

The defendant, however, contends that, inasmuch as the importations are used in the transportation from the farm or orchard to the processing plant, which may cover a distance from next door to five or six hundred miles, they are not chiefly devoted to an agricultural

use, and, citing the *Spreckels Creameries* case, *supra*, as analogous and applicable, contends that the evidence in the instant case is not sufficient to show chief use by fruit farmers.

The *Spreckels Creameries* case involved the classification of certain cylindrical metal 10-gallon cans, intended for use in the transportation of milk. It was apparent that the cans were not used in the milking of the cows, and, indeed, the record with respect to any use by dairy farmers was meager. The chief use shown by the evidence and upon which the importer relied in its contention that such cans were agricultural implements, within the meaning of the tariff act, was found to be in transportation of milk from the farms to creameries. While it was contended that the creameries were cooperative organizations owned by farmers, the record evidence failed to support this contention.

The decision in that case, against the contention of the importer, was based upon the insufficiency of the evidence showing the character of chief use of the cans. On this point, the court said:

It is manifest that the foregoing testimony is not sufficient to establish the fact that the chief use of these milk cans is upon the farm or by farmers, nor is it sufficient even to show that chief use is for transportation by cooperative creamery organizations composed of farmers.

The appellee creamery company is not itself engaged in agriculture, but in processing an agricultural product, and the chief use satisfactorily shown by the evidence in the case is only that by appellee, which we do not think can be declared agricultural in its nature.

We are not, therefore, presented with a case wherein there is shown chief use either by individual farmers on the farm itself or by organizations of farmers for transportation. Nor does it appear that the chief use is made up of a combination of use on the farm and transportation by farmers' organizations.

It may be further stated that even the transportation used by cooperative creameries shown by the testimony is limited to a section of the State of California, and this, under the doctrine declared by us in *Pacific Guano & Fertilizer Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 218, 228, T. D. 42240, would not be sufficient. * * *

We are of the opinion that the facts in the instant case present a situation considerably different from that which obtained in the *Spreckels Creameries* case, and do not warrant the application of the holding in that case to the case before us. It is clearly shown here that the boxes assembled from the imported merchandise are used on the farm in the harvesting of fruit crops, a function which it cannot be denied is purely agricultural. The same boxes, with the same fruit, are then used for transportation of the harvested crops to processing plants. There is no separation of use—it is a continuous use, harvesting and transporting, which we believe under the facts and law applicable to the situation characterizes the use of the importations as agricultural. We do not consider that the fact that the boxes are owned and controlled by the processing plants, rather than

by the farmer, as pointed out by counsel for the defendant, affects the situation, since it is the *use*, and not the ownership, which determines the classification status of the merchandise.

In our view, the principal features of the boxes came into being because of their use in the purely agricultural function of harvesting, that is to say, they were made in the dimensions in which imported in the first place because one man could easily handle that size during harvesting, and their shallowness and lack of tops prevented crushing or bruising the fruit during harvesting. It was their use for harvesting purposes which gave them their primary form and character, and we do not think that the continuation of that use into transportation divested them of their agricultural status.

Judgment will, therefore, issue sustaining the claim for free entry under paragraph 1604 accordingly.