Richard L. JONES
v.
UNITED STATES.
C.D. 2920;
Protest Nos. 64/20669-747, etc.

United States Customs Court,
Third Division.
March 13, 1967.

Stein & Shostak, Los Angeles, Cal. (S. Richard Shostak, Los Angeles, Cal., of counsel), for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Harold L. Grossman, New York City, trial atty.), for defendant.

Before RICHARDSON, Judge, and DONLON, Senior Judge.

RICHARDSON, Judge.

The merchandise in the involved protests consolidated for the purposes of trial was imported from Mexicali, Mexico, and invoiced and entered as "4-wheel cotton trailers" or "farm cotton wagons," free of duty under item 666.00. They were classified as "Vehicles (including trailers), not self propelled, not specially provided for, and parts thereof" and assessed with duty at the rate of 16 per centum ad valorem under item 692.60 of the Tariff Schedules of the United States.

Item 666.00 of the tariff schedules reads as follows:

Machinery for soil preparation and cultivation, * * * farm wagons and carts, and agricultural and horticultural implements not

specially provided for, and parts of any of the foregoing * * * Free

The record contains the testimony of four witnesses in plaintiff's behalf along with three exhibits. The defendant relying on the presumption of correctness of the collector's classification did not offer any evidence.

Plaintiff's first witness, Harold W. Sturges, testified that since 1958 he has been the general manager of Holtville Cotton Products, a cotton ginning firm, which is owned by various cotton growers situated in the Imperial Valley of California. Prior to 1958, he managed "the same physical facility" when it was known as the Sturges Ginning Co. He has also had experience as a store manager for the Goodyear Tire and Rubber Co. in Yuma, Ariz., where he sold tires for farm and passenger vehicles as well as trucks. Also, he has had experience in the use of tractors. On the basis of his experience in the sale of tires he distinguished farm tires from passenger tires in their different tread design and ply and bead construction. Farm tires are designed for carrying " * * * very heavy loads in proportion to their size at very slow speeds."

Being familiar with wheel construction, he further testified as to the differences between wheels for passenger cars and wheels for farm vehicles. Wheels intended for farm vehicles are of a heavier metal than passenger car wheels. There are also differences in "the design of the fastening point at the center of the disc" so as to sustain heavy loads at slow speeds.

He has worked with tractors and knows the various types of farm vehicles that are used in conjunction with tractors, as well as the hitches used to connect the tractor with the particular vehicle to be pulled. Farm vehicles generally use the clevis and pin type hitch which is particularly suited for farm work. Highway vehicles employ the ball type hitch or ring and spindle hitch depending upon the type of trailer.

At this point it was stipulated between counsel that plaintiff's exhibit 1, received into evidence without objection, is a photograph of the imported merchandise. The object pictured therein is rectangular in shape measuring approximately 30 feet in length, 8 feet in height, and about as wide as a highway trailer. It is supported by four wheels, a pair being located in the front and a pair in the rear, with a hitch extending from the front axle. The sides are of wire criss-crossing each other to form a square shaped pattern. The top is open to facilitate loading and unloading.

Sturges testified that the vehicle represented in plaintiff's exhibit 1 was designed by him and has, over the 30 years of his experience, been known as a "cotton wagon," the last 12 or 13 years, however, it having been referred to as a "cotton trailer" as least in the California region of the country. It was designed solely as a cotton wagon, that is to say "A receptacle into which cotton is deposited when it is picked, harvested, as a means of moving that cotton to the gin, and as a means of storage for that cotton until such time as it is ginned." It was later stated that the imported vehicles are not used until after the cotton is harvested.

The vehicle was designed so as to be especially adaptable to the Imperial Valley. Incorporated within the design was the twin fold purpose of capacity and maneuverability within a cotton field. To meet these ends the vehicle is light in weight, lengthy, limited in height by the particular construction of a cotton picking machine, of short turning radius, and of reinforced edges along the top as protection against contact with the picking machines. Its tires are farm tires not suited for extended highway travel at high speeds.

Normally the imported merchandise is used on farms or secondary roads between the cotton field and a centrally located gin. The vehicles are not equipped with lights, flaps, brakes, springs, or other devices. They do not travel along the roads at night and were they to travel at high speeds, the absence of springs would cause them to break apart.

Furthermore, it is not necessary to secure a commercial vehicle license to maintain their operation.

The cotton wagons in question are owned by Holtville Cotton Products Co., all of the shares of which are owned by the farmers whose cotton is delivered there for processing. The farmers borrow them from the gin at no charge, and connect them to pick-up trucks with clevis and pin type hitches. The vehicles are parked in open areas of the cotton fields and loaded through the open top. Upon arrival at the gin the cotton is removed from the vehicles through the open top by a suction pipe.

Sturges further testified as to his familiarity with highway trailers acquired during his years of experience. He stated that his organization owns one two-wheel trailer and one four-wheel trailer; that they differ from the merchandise at bar in that they have heavier chassis, shorter length, heavier axles, and the presence of springs, lights and flaps; that highway trailers are much higher in price and greater in weight, and invariably, at last in the larger ones, employ the ring and spindle hitch.

The witness identified plaintiff's exhibit 2 as a photograph depicting a cotton wagon similar to the imported vehicle except that it is constructed with board sides. The use of the two vehicles is the same.

Mr. Jorge Limon, a manufacturer of farm implements in Mexicali, Mexico, was plaintiff's second witness. He testified that he has occasionally produced " * * * commercial type trailer[s]." He identified plaintiff's exhibit 1 as a cotton wagon manufactured by his firm. Expressing familiarity with its use he corroborated the testimony given by Sturges further adding that the use of the wagons in the field for dumping in from a cotton machine or handpicking bags and carrying to the cotton gin has remained the same both before and after September 1, 1963.

He also testified as to the unsuitability of the imported vehicles for highway travel due to its design and construction, and that it would not be considered a " * * * commercial type vehicle."

Counsel stipulated that merchandise of the same type as is the subject matter of the case at bar was classified under paragraph 1604 of the Tariff Act of 1930, as wagons and carts, duty free.

Donald C. Utterback, Assistant Collector of Customs at the port of San Diego, testified as plaintiff's third witness. He identified a letter received by him from the Bureau of Customs dated January 20, 1964, pursuant to the collector's inquiry concerning the classification of merchandise of the character represented by plaintiff's exhibit 1, which was received in evidence as plaintiff's exhibit 4. It advised the collector that said merchandise is classifiable under item 692.60, if entered subsequent to the effective date of the Tariff Schedules of the United States; and if entered prior thereto it would be provided for in paragraph 1604 of the Tariff Act of 1930.

Utterback further testified that the records reflect importations of merchandise such as that at bar prior to September 1, 1963, and that his recommendation for classification of the importations at bar was made pursuant to plaintiff's exhibit 4. He stated that based upon observations prior to September 1, 1963, he was of the opinion that the use of the imported merchandise subsequent to the effective date of the Tariff Schedules of the United States has not changed.

Plaintiff's final witness was Charles Provost of Calexico, Calif., a cotton buyer since 1911. He has bought cotton "Throughout the western states from El Paso west * * *" and has observed various types of farm wagons. He identified plaintiff's exhibits 1 and 2, the use of which he has been familiar with from the 1890's to the time of trial, as wagons, the continual sole use of which has been to " * * * carry cotton from the farm to the gin." He testified that both in 1963 and 1964, he had observed the use of plaintiff's exhibit 1 in California. He has seen similar vehicles used to haul cotton from the farm to the gin in

use in Texas and other southern states during 1963 and 1964, and that in Texas, Louisiana, Mississippi, and Alabama, plaintiff's exhibits 1 and 2 are known as "cotton wagons."

The issues of the parties are:

1. Whether or not the imported vehicles fit the common meaning of the term "trailers"?

2. Assuming a negative response to the first inquiry, do the imported vehicles respond to the common meaning of the term "wagon" and if so, are they chiefly used as "farm wagons" as provided for by Item 666.00 of the Tariff Schedules of the United States?

■ It is well known that the court may refer to lexicographic authority to help ascertain the common meaning of a particular term. United States v. Tropical Craft Corp., 42 CCPA 223, 227, CAD 598. Thus in Webster's Third New International Dictionary, 1963, "trailer" is defined as:

* * * 4: a vehicle or one in a succession of vehicles hauled usu. by some other vehicle; as * * * c: a nonautomotive *highway* or industrial-plant vehicle designed to be hauled * * * e: an automobile-drawn *highway* vehicle designed to serve wherever it is parked as a dwelling or as a place of business * * * [Emphasis added.]

"Wagon" is defined therein as:

1a: heavy four-wheel usu. uncovered vehicle designed esp. for transporting bulky commodities and drawn orig. by animals * * * but now often by a motor vehicle (as a tractor) * * *

Funk and Wagnalls Standard Dictionary, International Edition, 1963, defines "trailer" as:

* * * 4. A caravanlike vehicle used as a dwelling and drawn on the *highway* by a motor car or truck. [Emphasis added.]

"Wagon" is defined by Funk and Wagnalls as:

1. A strong four-wheeled vehicle used to carry heavy loads of freight.

2. An open four-wheeled vehicle for carrying hay, corn, etc.: a farm *wagon*. 3. A light four-wheeled vehicle used for various business purposes, as a grocer's *wagon* * * *.

According to Roget's International Thesaurus, third edition, 1962, "wagon" is not a synonym for "trailer," and "trailer" is not a synonym for "wagon."

It would appear that the statutory term "wagon" as considered by the sources referred to above more closely encompasses the imports at bar than does the statutory term "trailer" notwithstanding that the imported vehicles are sometimes referred to as "cotton trailers." The *sine qua non* of "trailer" according to the above references would seem to be its capability of traveling along highways. As brought out by the evidence the imported merchandise is not designed or constructed for use nor employed except in rare instances on the highways. In any event it may be assumed for the purposes of this opinion that the imported merchandise is commonly known as wagons and not trailers. The use of an implement was the important factor in determining whether or not it should be classified as an agricultural implement under paragraph 1604 of the Tariff Act of 1930.

■ Chief use continues to be the important factor in the determination as to whether or not a particular import is susceptible of classification under item 666.00 in the Tariff Schedules of the United States, it being explicitly defined in the General Headnotes and Rules of Interpretation wherein the statute reads:

10(e) in the absence of special language or context which otherwise requires—

(1) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use

which exceeds all other uses (if any) combined;

Also see Tariff Classification Study, schedule 6, pages 265–266, to the effect:

that " * * * wagons and carts which are used on the farm to transport the crops to market" are classifiable as agricultural implements, J. C. Findlay v. United States, 36 Treas.Dec. 283, 285, T.D. 37964. This is entirely compatible with the alleged function of the vehicles at bar, insofar as a showing in the record of their chief use as " * * * farm wagons * * * " would support classification within item 666.00. Also see United States v. Boker & Co., 6 Ct.Cust. App. 243, T.D. 35472. The testimony in the case at bar leads us to believe that the imported vehicles are used as wagons for agricultural pursuits, notwithstanding some testimony that they come into use subsequent to the harvest, and establishes that they are chiefly used as farm wagons within the meaning of the phrase " * * * agricultural * * * implements * * * " over at least " * * * a large area of the country." Inasmuch as the transportation of cotton from the field to the gin is so intertwined with the actual harvesting of the cotton as to become almost merged, it is unreasonable to say that it is a wholly distinct operation.

 Testimony of personal observations of use in California, Texas, Louisiana, Mississippi and Alabama of such or similar cotton farm wagons embraces a sizable cotton producing section of the country upon which it is possible to project a determination " * * * that the involved articles would be used in substantially the same manner, and by substantially the same class of people, in one section of the country as in another * * * " so as to establish their chief use over " * * * a large area of the country." United States v. F. W. Woolworth Co., 23 CCPA 98, 100, T.D. 47765; A. N. Deringer, Inc. v. United States, 48 Cust.Ct. 138, C.D. 2326.

In A. N. Deringer, Inc. v. United States, supra, the first division of the Customs Court was concerned with im-

portations of fruit-picking ladders classified under paragraph 412 of the Tariff Act of 1930, as modified by T.D. 52373 and T.D. 52476, providing for manufactures of wood, not specially provided for. Claim was made for duty free classification under paragraph 1604 of the same tariff act. In support of its claim plaintiff introduced the testimony of one witness whose experience in the sale and use of the ladders was limited to New England. He testified as to the uniqueness of their design and construction for fruit picking purposes, that in his experience they had only been sold to farmers for the picking of fruit and that they are only practical for fruit picking due to the fact that the pointed top incorporated in their design would make them unstable if used against a home or building. He additionally rebutted the testimony of defendant's witness who had testified that he had observed the ladders used in washing windows.

The court felt that the plaintiff had made out a *prima facie* case and that the defendant had not successfully rebutted plaintiff's proof. The court further stated starting at page 140:

Defendant argues that plaintiff's evidence with respect to the use of ladders such as those at bar was limited to the New England area and is insufficient to constitute proof of chief use throughout the United States.

We find otherwise. From the testimony given by the plaintiff's witness as to the reasons and purposes for the particular design and construction of the imported ladders, i. e., lightweight for easy carriage and pointed at the top, so that they may be thrust up between the limbs of branches without catching thereon or disturbing the fruit, the pointed top being, as well, a factor which would make them unsuitable or impractical for other uses, we think it is a fair inference that their chief use in one part of the country would be the same as in any other part of the country. The reasonableness of such an inference under such circumstance was well stated in the

case of United States v. F. W. Woolworth Co. [supra].

The case of United States v. Spreckles Creameries, Inc., 17 CCPA 400, involving milk cans used to transport milk from the farm to a creamery, is to be distinguished from the case at bar in that in the *Spreckles* case there was not satisfactory evidence of record to show the character of chief use. There was only one witness who was the president of the Creamery Co., which was the importer, and he could only testify as to the actual individual use of the particular shipment in question in a part of the State of California. The protest at bar is supported by testimony of four witnesses for the plaintiff which establishes chief use in a representative area of the United States from which it may be inferred that the same chief use prevails in other parts of the United States.

 Taking judicial notice that California, Texas, Louisiana, Mississippi, and Alabama represent a major cotton producing area of the country we hold that the reasons for their design and construction would be applicable in the other cotton producing areas of the country and that the chief use in California and the southern states mentioned is representative of the chief use in other cotton producing areas. Accordingly, plaintiff has met its evidentiary obligations in establishing the chief use of the imported merchandise as farm wagons and carts which are agricultural implements not specially provided for under TSUS 666.00, and as such are entitled to be entered duty free.

Plaintiff's protest is sustained.

Judgment will be issued accordingly.

DONLON, Judge (concurring).

I concur in the result. I do so for reasons slightly different, in part, from those set forth by my colleague.

The weight of evidence here of record shows that the chief use of the wagons at bar is to gather cotton from the picker on the farm, for transport to the gin. Such gathering is part of the operation of harvesting the cotton, a view which the presiding judge also suggested in the course of trial.

The verb harvest is defined in Webster's New International Dictionary, 2d edition (1956), as follows:

To reap or *gather*, as any crop, material, or result; *to gather in a crop.* [Emphasis supplied.]

The record amply supports a finding that the chief use of these wagons is to "gather in" the cotton crop after it has been picked. That is a part of harvesting the cotton, and suffices to bring these wagons into the classification for farm wagons.

I find it unnecessary, therefore, to rely on J. C. Findlay v. United States, 36 Treas.Dec. 283, T.D. 37964, cited by Judge Richardson. *Findlay* arose long ago, under the Tariff Act of 1913. The merchandise there in litigation consisted of wool presses that were used on the sheep ranch to compress wool after shearing, without changing its condition or advancing it along the manufacturing line, preliminary to transport of the wool from the ranch to the mill. The tariff classification construed (paragraph 391 of the 1913 act) provided free entry for agricultural implements, as well as for farm wagons and carts.

The Board of General Appraisers held the wool presses to be agricultural implements. There was no suggestion that they were wagons or carts or entitled to classification as such.

See C. J. Tower & Sons v. United States, 32 Cust.Ct. 54, C.D. 1579, in which fruit boxes, used to *gather* fruit after it was picked, were held chiefly used in *harvesting* the fruit crop.