**SORTEX CO. OF NORTH AMERICA, Inc.**

v.

**UNITED STATES.**

C. D. 3329; Protest No. 64/13198–20082–63.

United States Customs Court,
Second Division.
Feb. 29, 1968.

Siegel, Mandell & Davidson, New York City (Joshua M. Davidson and Allan H.

Kamnitz, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Sheila Ziff and Thomas Fernandes, New York City, trial attorneys), for defendant.

Before RAO, FORD and WATSON, Judges.

WATSON, Judge.

The merchandise in the case at bar consists of five Sortex electronic color separating or sorting machines, type G 414, hereinafter referred to as "Sortex machines", which were classified under paragraph 353 of the Tariff Act of 1930, as modified by the Presidential proclamation to give effect to certain trade concessions, T.D. 55615 and T.D. 55649, at the rate of 12½ per centum ad valorem, as articles having as an essential feature an electrical element or device. Specifically, plaintiff contends that the Sortex color sorting machine is chiefly used in preparing an agricultural commodity for marketing in the same manner that cotton gins, cream separators, and sugar machinery are used to prepare agricultural commodities for market; and that it would be both uneconomical and impracticable for farmers to grow such "cash crops" as beans, nuts, and rice without the use of machines such as are here involved. Plaintiff claims that the merchandise in question is properly free of duty as agricultural implements under paragraph 1604 of said act.

The pertinent provisions of the paragraphs here under consideration are as follows:

Paragraph 353, Tariff Act of 1930, as modified by T.D. 55615 and T.D. 55649:

Articles having as an essential feature an electrical element or device * * not specially provided for:

* * * * * *

Other * * * ....12½% ad val.

Paragraph 1604, Tariff Act of 1930:

Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultiva-

tors, threshing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts * * * and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts * * *: *Provided,* That no article specified by name in Title I shall be free of duty under this paragraph.

The record in the case at bar consists of oral testimony of 7 witnesses, certain stipulations relating to the testimony of 2 additional witnesses and 13 exhibits received in evidence on behalf of plaintiff-corporation. (Plaintiff's exhibits 1–13).

The pertinent testimony of the witnesses for the plaintiff was as follows: Mr. Francis J. Mayer, testified that he was executive vice president and general manager of the plaintiff-corporation. He stated that he had traveled extensively in the United States to discuss with customers large installations of the Sortex electronic sorting machines (R. 6–7) and described the operation of the Sortex machine under consideration substantially as follows: The Sortex machine is used to electronically sort agricultural products which do not exceed the size of a walnut, such as peanuts, navy beans, lima beans, seed beans, peas, pecans, walnuts and rice. The machine separates such small agricultural products into two parts, the so-called "good" product and the so-called "reject", the latter meaning particles of foreign nature or particles which are diseased and unusable either for seeds or human consumption (R. 9). The sorting is accomplished by optically observing the product one by one while going through the Sortex machine, which operates as follows:

The product is fed into the machine through a hopper. It is conveyed on a belt, falls freely through an optical chamber, is viewed against so-called backgrounds by photo cells or photo multipliers, which trigger an electromagnetic division, whereby the undesired product is ejected by compressed air; the good product not being ejected, falls freely down in one container, the ejected product in another container, thereby the separation is achieved. [R. 10.]

In effect, the sorting of the object is made according to shade and color (plaintiff's exhibit 1). The object (or foreign matter) which does not approximate the desired color actuates a signal by the photocell, which signal in turn activates the air jet which ejects the undesirable object from the normal trajectory, thereby causing it to fall into a so-called "reject" chute. (Plaintiff's exhibit 2.) The witness had seen the Sortex machine sort said products in Texas, Michigan, California, Nebraska, Wyoming, Florida, Georgia, Virginia, and North Carolina (R. 11). The Sortex machines were sold to seed houses, producers of seed and agricultural products, elevators, cleaning installations, farmers' cooperatives, and canners and packers (R. 14–15). On cross-examination, Mr. Mayer stated that the electronic color sorting machines manufactured by his competitiors work on the same principle as the machines in issue (R. 16). This statement is supported by further testimony in the record (R. 34, 42, 90).

Mr. Albert L. Riedel testified that he was the founder, president, and general manager of the Michigan Bean Co., which he stated was the largest company in the bean business in the United States, handling 1/3 of the beans grown in this country. He testified that, originally, the farmer did his own bean sorting and brought the finished hand-picked product to the market place but that eventually, as the farmer's capacity to grow more increased, and for more practical and economic reasons, the electric sorting machine replaced the hand sorting machines (R. 27).

On cross-examination, Mr. Riedel testified that the Michigan Bean Co. was an elevator, and described an elevator as an installation located in the rural areas for the purpose of assembling the farmer's products, buying them, storing them, reselling them, shipping them, and at times sorting them (R. 35). When the product

was delivered to the country elevator, the operator determined the grade by hand, on the basis of which preliminary grading, a price per pound is set, at which point the farmer had the option to store his product (R. 30, 36, 37) or sell it to the owner of the elevator (R. 40). Thereafter, the beans are put through various cleaning processes. The final process, immediately prior to marketing, is when the beans go through the electric sorting machines such as those in issue (R. 42).

Mr. Hugo B. Hammerslag testified that he was vice president, secretary, and treasurer of the plaintiff-corporation (R. 43) and also vice president and sales manager of C. H. Runciman Co., Michigan, "large handlers and processors of beans". He agreed with the testimony of the previous witness with respect to the processes employed with the use of the electronic sorting device (R. 45), and as to the option available to the farmer to sell his produce (R. 55). He further stated that it would not be economically possible to sort beans and create a marketable commodity without the use of the electric sorting machines (R. 45–46).

On cross-examination, Mr. Hammerslag testified that where the farmer elected to store the beans, the farmer had nothing to do with the processing of the beans after their receipt by the elevator. The processing undergone by the beans to prepare them for market are functions performed by the elevator. The witness further testified that when he referred to "market", he was referring to the wholesale distributors, the buying trade, which in turn, distributed to the consumer (R. 71).

Mr. Rolla Donnan stated that he was a farmer and also connected as chairman of the executive committee of a farmers' cooperative elevator, handling beans, wheat, and all kinds of grain. He testified that the field grade product is hauled to the elevator for the complete processing of the commodity (R. 78) and that the farmer bears the cost of the sorting (R. 80). Pertinent to our present determination, the record discloses the following:

BY JUDGE WATSON:

Q. You testified at the outset that you were a member of the Cooperative Elevator.—A. Yes. This is a strictly farmer's owned elevator.

Q. Is this considered to be a separate business over and above that of your farm?—A. Yes, sir. [R. 86]

Milton E. Burns testified that he was the general manager of the Breckenridge Wheeler Co-Op, Inc., Michigan. (R. 87) This "co-op" uses an electronic sorter in the same manner as the Sortex machine under consideration. When field grade beans (plaintiff's exhibit 7) were received at this co-op elevator, samples were taken, percentage of coloration was established, and the beans were processed, including electronic sorting for which a service charge was made to the farmer (R. 90–91). When the beans are first received, a sample is taken to establish their quality or grade, at which point the farmer had the option to sell the crop to the co-op at the market price prevailing on that day. Thereafter, the co-op processed the beans and made them available for shipment. In the opinion of the witness, the product becomes marketable after it goes through the cleaning equipment including the electronic sorting (R. 108).

Americo O. Dompe, a farmer and warehouseman, presently farming in excess of 12,000 acres of beans, testified that he owned a public warehouse and that beans harvested by him, as well as beans of his neighbors, are taken into the warehouse and there cleaned and sorted. The operation was similar to that of the elevators previously discussed (R. 110). He stated that approximately 75 percent of the beans handled by his warehouse were electronically sorted.

On cross-examination, Mr. Dompe testified that in cases where part of the end product after the sorting is sold back to farmers for seed production, 60 percent of his warehouse business was devoted to the selling of beans for seeding purposes, and 40 percent of the beans sorted were sold to trade channels for human consumption. (R. 125).

Don W. Sands testified that he was a director of the Gold Kist Peanut Growers, a farmers' cooperative, operating in Georgia, Florida, Alabama, Texas, Arizona, and North Carolina. His testimony discloses that the peanuts sorted at his cooperative are subject to electronic sorting, it appearing that of his total crop of peanuts handled, about 20 percent was set aside for seed. The record further discloses the following:

JUDGE WATSON: Does title still remain with the farmer, until such time as the State and Government have their final inspection?

THE WITNESS: Not as such, * * it is not practical to keep things segregated as such, you just have to put them together * * * for proper cleaning and storage. So I will have to say no to you. [R. 143.]

The parties to the controversy stipulated that if the same questions were asked of Mr. Luther Turner, president of Turner Sales & Supply Co., Georgia, as were asked of Mr. Don W. Sands, with reference to the operation and use of electronic sorting machines with respect to peanuts, the same answers would be given as were given by Mr. Sands (R. 147–148).

It was also stipulated that if Mr. Donald Lyttelton, president of Southern Construction & Mill Supply Co., Texas, were called as a witness, he would testify that 10 percent of the Sortex machines were used in the rice industry; and that $\frac{1}{30}$ of all the rice harvested went through the electronic color sorting, "the last step prior to selling said $\frac{1}{30}$ of the rice" to the Government, wholesalers for packaging and for export. The establishments where rice was processed were owned by cooperatives or independent operators.

■ The primary question in the case at bar is whether the machines in question are properly classifiable as agricultural implements. It is well settled law that paragraph 1604 of the tariff act is more specific than paragraph 353 of said act, as modified, supra, provided, of course, that the imported article is not specified by name in Title I of said act. (Staalkat of America, Inc. v. United States, 54 Cust.Ct. 161, C.D. 2526.) A review of the dutiable provisions of said act, Title I, clearly establishes that the imported article is not specified by name. Accordingly, if the imported article is an agricultural implement, its proper classification lies within the purview of paragraph 1604. The basic test to ascertain whether an article is embraced within the provisions of the claimed paragraph is whether the article belongs to that class or kind which is chiefly used as an agricultural implement in the production of food from the soil or the raising of domestic animals for food or raiment. United States v. Boker & Co., 6 Ct.Cust. App. 243, T.D. 35472; United States v. Tower, 6 Ct.Cust.App. 562, T.D. 36199.

Counsel for both the plaintiff and the defendant have directed our attention to a number of cases wherein our courts have passed upon the question as to what constitutes an agricultural implement for tariff purposes. Such cases will be hereinafter discussed as in our opinion are deemed pertinent in the determination of the proper classification of the merchandise in question.

In United States v. Spreckels Creameries, Inc., 17 CCPA 400, at page 404, T.D. 43835, the court, in finding that there was not satisfactory evidence in the record to show a character of chief use as to entitle certain cans used for the transportation of milk to classification as agricultural implements, stated:

From what was developed upon the redirect examination of the witness it appears that the cans have no use in the manufacturing operations, but are simply used for transportation, but there is no evidence anywhere as to how the cans are generally owned, other than the ones of the involved importation and these belong to appellee.

It is manifest that the foregoing testimony is not sufficient to establish the fact that the chief use of these milk cans is upon the farm or by farmers, nor is it sufficient even to show that chief use is for transporta-

tion by cooperative creamery organizations composed of farmers.

The appellee creamery company is not itself engaged in agriculture, but in processing an agricultural product, and the chief use satisfactorily shown by the evidence in the case is only that by appellee, which we do not think can be declared agricultural in its nature.

We are not, therefore, presented with a case wherein there is shown chief use either by individual farmers on the farm itself or by organizations of farmers for transportation. Nor does it appear that the chief use is made up of a combination of use on the farm and transportation by farmers' organizations.

In C. J. Tower & Sons v. United States, 32 Cust.Ct. 54, C.D. 1579, the merchandise involved certain boxes imported in a knocked-down condition, and used after assembly for harvesting fruit and transporting same to processing plants. The court therein distinguished the *Spreckels Creameries* case, supra, as follows:

We are of the opinion that the facts in the instant case present a situation considerably different from that which obtained in the *Spreckels Creameries* case, and do not warrant the application of the holding in that case to the case before us. It is clearly shown here that the boxes assembled from the imported merchandise are used on the farm in the harvesting of fruit crops, a function which it cannot be denied is purely agricultural. The same boxes, with the same fruit, are then used for transportation of the harvested crops to processing plants. There is no separation of use—it is a continuous use, harvesting and transporting, which we believe under the facts and law applicable to the situation characterizes the use of the importations as agricultural. * * *

In D. Landreth Seed Co. v. United States, 2 Cust.Ct. 272, C.D. 141, the court held a certain machine for sorting peas or beans for seed purposes properly entitled to free entry under the provision in paragraph 1604, Tariff Act of 1930, for other agricultural implements, as alleged by the plaintiff, rather than dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said act as a machine not specially provided for, as classified by the collector. In its decision, the court in the *Landreth* case, in passing upon the term "agricultural implements", at page 274, observed:

It is manifest that the application of this rule does not confine agricultural operations to those performed before the harvesting, but includes operations preparatory to marketing agricultural products. * * *

* * * * * *

It is true that in the case of Ohio Butterine Co. v. United States, T.D. 37656–G.A. 8171, 34 Treas.Dec. 465, an oleomargarine churn was held by this court not to be an agricultural implement. But there the testimony was uncontradicted that the involved churn was installed in a manufacturing establishment in no way connected with a farm or farming operations.

Similarly, this court in Mangelsdorf Seed Co. v. United States, Abstract 44461, 40 Treas.Dec. 441, and in Eddey Bellefleur v. United States Abstract 44462, 40 Treas.Dec. 441, held certain seed cleaning machines and certain oat crushing machines not to be free as agricultural implements. But according to the uncontradicted evidence in both of such cases the machines were employed in factories or mills and not upon farms.

The court, in the *Landreth* case, thereupon stated:

However, in the instant case it is conclusively established that the machine in question is exclusively used on farms by the plaintiff corporation in its business of raising peas and beans for seed purposes.

The facts in the *Landreth* case, supra, cannot, however, be compared with those in the case at bar. There, the record conclusively established that the sorting machine in question was exclusively used

on the farms by the plaintiff in raising peas and beans for seed purpose. In the case of the machines at bar, however, they were not employed by farmers on the farms, but by business enterprises such as elevators, warehouses, and co-operatives, etc., at centralized plants or terminals which processed the crops that were produced by the farmer and commercially sorted the agricultural products more efficiently and economically to render their sale more marketable. These elevators and cooperatives are not connected either directly or indirectly with the production of food for man. These latter factors distinguish, in our opinion, the situation in the case at bar from that in the *Landreth* case and persuade us that the machines at bar are not "agricultural implements" for tariff purposes. See, in this connection, Mangelsdorf Seed Co. v. United States, 40 Treas.Dec. 441, Abstract 44461, and the holding of the court in J. M. McCullough's Sons Co. v. United States, (1927), 51 Treas.Dec. 1091, Abstract 2055.

In the recent case of Staalkat of America, Inc. v. United States, 54 Cust.Ct. 161, C.D. 2526 (also involving an egg handling machine which sizes, candles, and marks eggs), the court, in holding that the machine there under consideration was not properly classifiable as an agricultural implement, at page 164, stated:

> Nevertheless, the true test for the determination of whether a machine such as is involved herein, the sole functions of which are the sorting, grading, and marking of eggs, is an agricultural implement is not who owns it or where it is used, but, what is its chief use? In other words, is it chiefly used for agricultural purposes? Irrespective of who owns the instant machine or where it is located, it seems obvious that it performs the functions of a marketing device, and is not one devoted to the agricultural production of food, to wit, eggs. Therefore, the machine is clearly excluded from the provision for "agricul-

tural implements." Every article used by a farmer is not necessarily an agricultural implement within the intendment of paragraph 1604, supra, W. J. Byrnes & Co. v. United States, 30 CC PA 166, C.A.D. 229.

In certain of the cases decided by our appellate court on the question of classification of merchandise as agricultural implements, there is language to the effect that preparation of crops for market pertains to agriculture. (Wilbur-Ellis Co. v. United States, 26 CCPA 403, C.A. D. 47 (steel ties chiefly used to tie hay compressed into bales by balers), and Staalkat of America, Inc. v. United States, 59 Cust.Ct. ——, C.D. 3130, decided September 27, 1967 (egg handling machine, which sorted, candled and graded eggs according to size).) However, the court in the latter case held to the effect that such preparation of crops for market must be a necessary incident to the production by the farmer of food or raiment for man, and not a necessary incident to the processing and marketing of crops as a separate and commercial enterprise. See, in this connection, William A. Rogers, Inc. v. United States, 59 Cust.Ct. ——, C.D. 3178, decided October 30, 1967.

After referring to a number of cases as to what constitutes agricultural implements, the court in the *Staalkat* case (C.D. 3130), supra, stated:

> In view of these authorities, it appears that the provisions for free entry for agricultural implements, not provided for specially in tariff acts, include on-farm equipment for handling, packing, preparing for market, crops produced on the farm, but does not include equipment used commercially for packing or marketing for others or for the manufacture of food products. *Such preparation for marketing must be as an incident to production by the farmer and not primarily as an incident to marketing as a separate enterprise.* [Italics ours.]

and then observed:

> The Staalkat machine involved herein has no function or use in the pro-

duction of food or raiment for man; its use does not improve the quality of eggs; although employed in the efficient raising of poultry, that is not its chief use; it is not used merely to put eggs into convenient form for transportation to market. It is designed and used to sort eggs according to size, and is designed and in many cases used in candling or grading eggs. According to Dr. Carpenter, it helps very materially in marketing eggs. Sorting and candling are not strictly necessary to the sale of eggs by the farmer as they can be sold to processors or distributors who will perform these operations before sale to the ultimate consumer. Some eggs are still bought unwashed and ungraded by the consumer directly from the farmer. Mr. Corbetta testified that marketing to the ultimate consumer was a very complicated operation performed by distributors and dealers.

The evidence presented here does not clearly establish that these machines are chiefly used on farms or by farmers. In the incorporated case, Dr. Carpenter testified that there were 150 Staalkat machines in the country, but the location or ownership of only 36 of them was shown. These were owned by processors or so-called farmer processors. Dr. Carpenter testified further that 20 percent of the machines were owned by processors and that the rest were owned by large independent farmers, farmer cooperatives, or farmer-processors.

In Italian Vineyard Co. v. United States, 56 Treas.Dec. 791, Abstract 9568, certain grape crushers or stemmers designed and exclusively employed for crushing grapes on plaintiff company's ranch or vineyard in the manufacture of grape juice, were denied duty-free entry as agricultural implements. In overruling the protest, the court stated:

> Certainly we are not prepared to hold as matter of law that merely because a manufacturing device or mechanism is installed upon the farm such machine becomes ipso facto an agricul-

tural implement. To so hold would mean that the mechanism for shredding wheat for indiscriminate table use is an agricultural implement. The same would be true of the machinery used in the production of corn flakes and all other well-known breakfast foods. Merely to state the proposition shows its fallacy.

The record in the case at bar discloses that the Sortex machine helps very materially in the marketing of crops. However, "sorting" by the Sortex machine is not at all necessary to the sale of agricultural products by the farmer. Plaintiff's witness, Hammerslag, testified on cross-examination that not all of the beans picked in Michigan are put through the electronic eye sorting machine, of the type here in issue, but that "certain beans that are produced by the grower are of such a high quality in certain years that a shippable grade can be made without electronic sorting" (R. 56). Plaintiff's witness, Burns, testified that in some instances a percentage of the products reaching his elevator does not go through the electronic process (R. 108). Accordingly, it would appear that some high grade crops are sold by the farmers directly from the field without ever being subjected to the sorting process of the Sortex machine or one of like character. In the above connection, the court in the *Staalkat* decision (C.D. 3130) stated:

> The Staalkat machine * * * has no function or use in the production of food or raiment for man * * *. It is designed and used to sort eggs according to size * * *. Sorting and candling are not strictly necessary to the sale of eggs by the farmer as they can be sold to processors or distributors who will perform these operations before sale to the ultimate consumer.

The Sortex machine and machines of like character were designed and used commercially to sort agricultural products by color (R. 91). In the *Staalkat* cases, supra, the imported Staalkat machines sorted eggs by size. The court there held

that sorting is a marketing process *per se* and not an agricultural pursuit. The records in said cases disclosed that unlike the Sortex machines at bar, the machines there in question were used extensively by the farmers.

■ While it is true that in order to carry out the evident purpose of Congress to favor agriculture, the courts have always given the agricultural free list provisions a very broad and liberal construction (United States v. American Express Co., 12 Ct.Cust.App. 483, T.D. 40693), we do not believe the provisions of paragraph 1604 of the Tariff Act under consideration should be extended to include machines such as those at bar, where the record shows that in the main the operations performed by the Sortex machines are not devoted to the production of food as such, and are not used by farmers on the farm in agricultural pursuits. Neither does the use of these machines improve the quality of the crops which are sorted. The record establishes, in our opinion, that commercially the chief use of these machines is in the efficient and economical processing of the agricultural products which are sent to the "elevators" or cooperatives for such purposes. It appears that "the processing undergone by the beans to prepare them for market are functions performed by the elevator" (R. 56, 58) and that "most of the times" the farmers sell their products to commercial warehouses and elevators or cooperatives (R. 82, 103), these cooperatives and other commercial enterprises of like character being engaged solely in the business of preparing the crops, by processing and sorting, for resale to the wholesale distributors (R. 83) and "to brokers, to canneries, for export market" (R. 104). These factors, in our opinion, negative a finding that the involved machines are properly classifiable as "agricultural implements".

■ Not every device or machine that is employed in agricultural pursuits is to be considered an agricultural implement for tariff purposes. As was stated in W. J. Byrnes & Co. v. United States, 30 CCPA 166, 170 C.A.D. 229:

To accept the suggestion of appellant that "agricultural implements of any kind or description" should cover everything that fulfills or supplies a want of the agriculturist in the pursuit of his occupation, if chiefly so used, would be to free-list things which clearly were never intended to be so treated by Congress.

■■ As heretofore indicated, plaintiff in the case at bar must affirmatively establish that the imported articles belong to that class or kind of articles which are chiefly used as agricultural implements in the production of food or raiment for man. Staalkat of America, Inc. (C.D. 3130) supra. Even of the uses of the Sortex machine at bar to prepare beans and peanuts for selling purposes were *arguendo* construed to be agricultural in nature, nevertheless, plaintiff in this case has, in our opinion, failed to establish that the machine in question is chiefly used as an agricultural implement within the provisions of paragraph 1604 of the relevant tariff act.

After careful consideration of the testimonial evidence herein, and review of the cases referred to by the parties in their briefs, as well as a consideration of established judicial precedents, we are of opinion that the electronic sorting machines here in question are not properly classifiable as agricultural implements within the contemplation of paragraph 1604 of the Tariff Act of 1930. There appears to be no question but that these machines are embraced within the provisions of paragraph 353 of the tariff act, as modified, as articles having as an essential feature an electrical element or device, and plaintiff in this case has not sustained its burden of overcoming this presumptively correct classification. Accordingly, the protest claim in this case is overruled.

Judgment will issue accordingly.