## NORMAN G. JENSEN, INC.

### v.

### UNITED STATES.

**C.D. 4634 and Court No. 73-7-02041.**

United States Customs Court.

Feb. 12, 1976.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and James S. O'Kelly, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Andrew P. Vance, Steven P. Florsheim and Wesley K. Caine, New York City, trial attorneys), for defendant.

FORD, Judge:

Certain four-wheeled tractors, models C5D and C6D, denominated "Tree Farmers" by the manufacturer were classified under item 692.35 TSUS, as modified by T.D. 68–9, as "other" tractors and assessed with duty at 5.5 per centum ad valorem. Plaintiff contends said tractors are entitled to entry free of duty under provision of item 692.30 TSUS as tractors suitable for agricultural use.

The parties agree upon the actual and predominant use of the involved tractors. For all practical and commercial purposes they are used to "skid" logs and are accordingly suitable for such use. The question presented by plaintiff is whether forestry is an agricultural pursuit within the meaning of item 692.30, *supra*. Defendant contends the issue is whether logging is an agricultural pursuit within item 692.30, *supra.*

The pertinent statutory provisions read as follows:

Tractors (except tractors in item 692.40 and except automobile truck tractors), whether or not equipped with power take-offs, winches, or pulleys, and parts of such tractors:

| | | |
|---|---|---|
| 692.30 | Tractors suitable for agricultural use, and parts thereof .................. | Free |
| 692.35 | Other .................. | 5.5% ad val. |

The record consists of the testimony of fourteen (14) witnesses, seven (7) called on behalf of each party, and the receipt in evidence of nine (9) exhibits for plaintiff and eight (8) for defendant.

The background and experience of the witnesses called on behalf of plaintiff are as follows:

Mr. Raymond Charles Glavish, Thunder Bay, Ontario, Canada, has been employed by the Canadian Car Division, Hawker Siddeley Canada, Ltd. for 11 years. He has had various management and marketing positions, including general manager of Can-Car, Inc. from 1963 to 1973. He has acquired familiarity with Tree Farmers through sale and distribution and actually observing the tractors in use "in most every state" where timber is harvested.

Mr. Harold Morgan Murphy, Montgomery, Alabama, is president of Leary & Owens Equipment Company. He has purchased Tree Farmer log skidders from Can-Car, Inc. (including those in entries 101150 and 101146) and has sold them in Alabama and Florida.

Mr. Horace W. Johnson, Isle of Palms, South Carolina, is a forestry equipment dealer in Moncks Corner, South Carolina. He has purchased Tree Farmers from Can-Car, Inc. for five years.

Mr. Clyde Alvin Dyson, Springfield, Georgia, has been a logging contractor for seven years. He has used a Tree Farmer for two years.

Mr. Ronda Wayne Dunn, Alexandria, Louisiana, is district sales manager for Can-Car, Inc., Atlanta, Georgia. He calls on dealers west of the Mississippi River. He has been with Can-Car, Inc. for four and one-half years and is a graduate of Auburn University, Department of Forestry under the School of Agriculture.

Mr. Walter Furgat, Brattleboro, Vermont, is president of Furgat Tractor & Equipment, Inc. He has sold and serviced farm and forestry equipment for 22 years. He has been a dealer for Can-Car, Inc. in Vermont, New Hampshire, Massachusetts and Connecticut for eight years and has viewed Tree Farmers in use.

Mr. Harry E. Fisher, Grand Marais, Minnesota, is president of North Shore Forest Products, Inc., a logging concern. He has been involved in general administrative and operational supervision for nine and one-half years. He is a graduate of the University of Minnesota School of Forestry. His company owns and uses four Tree Farmer Skidders. He has also observed their use throughout northern Minnesota.

A brief description of the background of witnesses called on behalf of defendant is as follows:

Mr. Samuel T. Hudson, Jr., Fairfax, Vermont, has been a county forester with the Department of Forests and Parks, State of Vermont for 16 years. He holds a B.S. degree in forest manage-

ment from North Carolina State University. He has seen log skidders at work four to six times per month since 1962.

Mr. Harry Gene Gibson, Morgantown, West Virginia, is a research mechanical engineer, project leader with the Forest Service, United States Department of Agriculture. He holds a B.S. degree in mechanical engineering and an M.S. in forest engineering from West Virginia University. He has seen the Tree Farmer in operation and has done some research on four-wheeled skidders.

Dr. John H. Ohman is director of the North Central Forest Experiment Station, U.S.D.A., Forest Service, St. Paul, Minnesota. He holds a B.S. in forest management and a Ph.D. in forest pathology from the University of Minnesota. He does research in all phases of forestry and has worked for the Forest Service approximately 12 years. He has observed log skidders in operation.

Mr. William C. Gooder, Wausau, Wisconsin, has been regional representative for the International Woodworkers of America (a labor union) for three years. He represents some log skidder operators and has seen them at work but he has never worked in a forest nor run a skidder for his livelihood.

Mr. Stanley R. Olsen, Ely, Minnesota, has been a logger for 24 years. He has owned and operated a four-wheeled skidder for two years.

Mr. Ferdinand H. Thums, Isabella, Minnesota, has been a logger for 10 years and has owned two four-wheeled skidders for 6 years.

Mr. Jack Benns, Chicago, Illinois, is president of three subsidiaries of Pettibone Corp., a forest equipment manufacturer. He supervises manufacturing, engineering and marketing of forest equipment. He has been with the company for 30 years.

The record establishes the imported tractors are predominantly used to skid logs in the harvesting of trees. There is some testimony indicating additional uses with attachments to cut down trees, for site preparation, fertilization, hauling wagons, etc. Illustrative exhibits 1 and 2 depict the imported tractors. The construction and design of the involved tractors make them particularly suitable for skidding logs. These features include four large wheels instead of two, four-wheel drive, articulated design (hinged in the center), weight distribution, logging arch winch and high ground clearance. The tractors are thereby provided with greater maneuverability and utility when operating among trees. The Tree Farmers are sold to tree harvesters, logging contractors, pulpwood companies, woodsmen, farmers and individuals.

Skidding entails the removal of a severed tree trunk from the area in which it was growing to a more suitable place for transportation known as the landing area. According to witnesses, Glavish, Dunn, Furgat and Fisher, the fallen tree would have no economic value without the skidding process. In addition, without removal of the tree, it would impede the planting of another crop of trees. The harvesting of trees in the opinion of witnesses Glavish, Johnson, Dunn, Hudson, Fisher and Ohman includes the process of moving a crop of timber. This process terminates when the logs reach the landing area.

The use of the involved tractors for skidding logs from the growing area to the landing area is borne out by the record. The basic disagreement among the witnesses is whether this constitutes an agricultural pursuit or a logging operation. Plaintiff's witnesses Glavish, Johnson, Dyson, Dunn and Fisher consider the planting, cultivating and harvesting of trees an agricultural pursuit. Defendant's witnesses, on the other hand, consider it as logging which is a function of the lumbering industry. According to witnesses Ohman and Benns lumbering is an industry separate and apart from agriculture. The witness Gooder testified that the labor union representing loggers includes lumbermen and sawmill workers but does not represent agricultural workers. Defendant further contends that since forests do

not produce an annual crop and are a renewable natural resource as distinguished from a crop which is planted annually, they do not fall within the understanding of the term agriculture.

The science of silviculture relates to the growing of trees. The definition of this term as contained in *Terminology of Forest Science, Technology, Practice & Products* (Society of American Foresters, Washington, D. C., 1971) is illuminating and reads as follows:

SILVICULTURE (s. c.)

(1) Generally, the science and art of cultivating (i. e. growing and tending) forest crops, based on a knowledge of silvics.

(2) More particularly, the theory and practice of controlling the establishment, composition, constitution and growth of forests. [Pp. 240–241.]

The court is aware and may take judicial notice that all forest areas are not maintained for the purpose of timber. The federal government recognizes this in providing the National Forest Wilderness System the objectives of which are set forth in 36 C.F.R. 293.2 and read insofar as is pertinent as follows:

* * * In carrying out such purposes, National Forest Wilderness resources shall be managed to promote, perpetuate, and, where necessary, restore the wilderness character of the land and its specific values of solitude, physical and mental challenge, scientific study, inspiration, and primitive recreation. To that end:

(a) Natural ecological succession will be allowed to operate freely to the extent feasible.

(b) Wilderness will be made available for human use to the optimum extent consistent with the maintenance of primitive conditions.

(c) In resolving conflicts in resource use, wilderness values will be dominant to the extent not limited by the Wilderness Act, subsequent establishing legislation, or the regulations in this part.

In addition to the foregoing, Congress by means of H.R. 4728, 75th Congress, 1st Session (May 18, 1937), enacted the Cooperative Farm Forestry Act, which reads as follows:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That in order to aid agriculture, increase farm-forest income, conserve water resources, increase employment, and in other ways advance the general welfare and improve living conditions on farms through reforestation and afforestation in the various States and Territories, the Secretary of Agriculture is authorized in cooperation with the land-grant colleges and universities and State forestry agencies, each within its respective field of activities, according to the statutes, if any, of the respective States, wherever such agencies can and will cooperate, or in default of such cooperation to act directly, to produce or procure and distribute forest trees and shrub planting stock; to make necessary investigations; to advise farmers regarding the establishment, protection, and management of farm forests and forest and shrub plantations and the harvesting, utilization, and marketing of the products thereof; and to enter into cooperative agreements for the establishment, protection, and care of farm- or other forest-land tree and shrub plantings within such States and Territories; and, whenever suitable Government-owned lands are not available, to lease, purchase, or accept donations of land and develop nursery sites for the production of such forest planting stock as is needed to effectuate the purposes of this Act, but not including ornamental or other stock for landscape plantings commonly grown by established commercial nurserymen, and no stock grown in Government and cooperating nurseries shall be allowed to enter regular trade channels. No cooperative reforestation or afforestation shall be undertaken pursuant to this Act unless the cooperator

makes available without charge the land to be planted. There is hereby authorized to be appropriated annually not to exceed $2,500,000 for carrying out the purposes of this Act. This Act shall be known as the Cooperative Farm Forestry Act.

Approved May 18, 1937. [50 Stat. 188.]

Congress in the appropriation for the Forest Service on June 4, 1936 under the heading "Forest Influences" stated as follows:

Forest influences: For investigations at forest experiment stations and elsewhere for determining the possibility of increasing the absorption of rainfall by the soil, and for devising means to be employed in the preservation of soil, the prevention or control of destructive erosion, and the conservation of rainfall on forest or range lands, $269,152: *Provided,* That $170,-000 of this appropriation shall be available only for maintenance in nurseries of existing stocks and for the free distribution thereof to farmers, in liquidation of the so-called shelter belt project of trees or shrubs in the plains region undertaken heretofore pursuant to appropriations made for emergency purposes. [49 Stat. 1438–39.]

With respect to the shelter belt project referred to *supra,* the following information contained in the *Forestry Handbook* (Ronald Press, 1955) sets forth its benefits as follows:

SHELTERBELTS AND WIND-BREAKS. Beneficial Influences. The beneficial influences of windbreaks and shelterbelts have been well established by land users in the United States and many foreign countries. Such plantings diminish by as much as 20 to 30 percent the amount of fuel that is needed to heat a home. Livestock winter better on less feed and with greater weight gains in the protection of windbreaks and shelterbelts. Properly designed shelterbelts protect cultivated fields from wind erosion and give growing crops considerable protection from wind damage. The saving of one season's crops sometimes compensates for the entire cost of the planting. The average gain in crop yields will more than compensate for the area occupied by shelterbelts. The greatest returns have been realized from plantings established for the protection of orchards. The increase in grade of some fruits frequently runs as much as 25 to 50 percent. The accumulation of water in the form of snow within, and to the leeward of, the shelterbelts is an important factor in building up the ground water supply and providing moisture for growing crops.

The cumulative effect of shelterbelts systematically placed over large acreages has not been thoroughly studied. Such information as we have indicates that the cumulative effect is of considerable importance and should have a place in long-range community planning. [Sec. 6, pp. 63–64.]

From the foregoing it is apparent the growth and production of trees for other than timber use are numerous.

There is of course the growth of trees for timber purposes. *The Book of the States,* Vol. XX (Council of State Governments, Lexington, Ky., 1974–1975), sets forth the following:

More than 70 percent of the Nation's commercial forest land is owned by private citizens and 60 percent is in farms and other nonindustrial holdings involving over 4 million landowners. These are the so-called "small owners" (i. e., less than 500 acres) who own the most productive forest land. Technical forestry assistance is available to these owners through the state forestry organizations on an advisory and educational basis. The state foresters, in many cases, advise owners of larger areas to secure the services of a private consultant. The federal government, through the U.S. Forest Service, provides financial and other assistance to the state foresters in carrying out this program. Assistance and advice

to private landowners covers tree planting, timberstand improvement, improved harvesting, marketing assistance, and formation of management plans to help meet the owner's objectives. One of the major problems in establishing good forest practices on small private woodlands in some areas of the Nation is lack of adequate markets for local species and small-sized trees. However, on August 10, 1973, the President signed the Agriculture Bill of 1973. Title X of the act includes a Forestry Incentives Program designed to encourage the small private landowner to plant and manage his woodland primarily for timber production. Cost-sharing programs will be developed by the U.S. Forest Service and the State foresters. * * * [P. 488.]

John Frederick Preston authored a book entitled *Farm Wood Crops* (McGraw-Hill, 1st ed., 1949). In chapter 5 entitled "Problems of Forestry on the Farm," the author makes an astute observation:

Farm forestry is not a forestry job on farmland; it is a farm job on forest land. There is a great difference between these two concepts and in the resulting approach to the problem. The starting point in farm forestry is not really forestry at all—it is farm planning. The farm must be analyzed to find out just what place in farm economy the woodland can fill. It is not sufficient to help the farmer sell his ripe timber and to show him how to mark the trees. The farmer must make a momentous decision, namely, that certain specified farmland, over the years, will contribute most to the business of farming if devoted to the growing of forest crops. [P. 58.]

As stated *supra*, it is the position of defendant that since trees are not produced on an annual basis they do not fall within the term agriculture. The court's view is to the contrary.

According to witness Johnson pine trees in the Southern States are harvested 10–15 years after planting. It is noteworthy that not all agricultural crops have annual crops. Newly planted fruit trees do not bear fruit on an annual basis as indicated in the U.S. Department of Agriculture, Leaflet No. 172, entitled "Why Fruit Trees Fail to Bear," which sets forth the following dates of maturity:

The age (from planting) when trees can be expected to bear fruit are as follows:

| Variety | Time in Years |
|---|---|
| Apple | 2 to 5 |
| Apricot | 2 to 5 |
| Cherry, sour | 3 to 5 |
| Cherry, sweet | 4 to 7 |
| Citrus | 3 to 5 |
| Fig | 2 to 3 |
| Peach | 2 to 4 |
| Pear | 4 to 6 |
| Plum | 3 to 6 |
| Quince | 5 to 6 |

That the annual harvesting of trees is a desired method is indicated in *Harvesting Timber Crops* by Wackerman, Hagenstein and Michell (McGraw-Hill, 2d ed., 1966), wherein the following statement is made:

* * * All agricultural operations, for example, are directed toward the development of timber stands as rapidly as is consistent with the quality of wood desired. Thinning, pruning, cleaning, and other cultural operations are designed to hasten the growth and development of and to improve the quality of marketable crops of trees; thus harvesting the crop is an achievement resulting from, or made possible by, past forestry efforts.

Harvesting time in the forest, as on the farm, is the time of cash income. It is payday in the woods. Continual harvesting operations day-by-day and year-by-year are much more desirable in the forestry business than infrequent or intermittent harvesting: Hence, most forests are managed for an even harvest flow year-by-year. [P. 7.]

The utilization by the defendant of the *Standard Industrial Classification Manual* * for the purpose of indicating that logging is not within the scope of agriculture is not determinative. It is noted that "Forestry" is in the same division—A—as agriculture although in a different group. The growing of trees (forestry) for timber purposes can only come to that position if the crops (trees) are harvested and sent to market.

■ Without the skidding process, the fallen stem would have no economic or residual value. As the court perceives the issue it matters not who uses the Tree Farmer, that is, whether the trees are harvested by commercial loggers, farmers, or itinerant laborers. Nor does it matter whether the end product is utilized for fuel, fencing, lumber, woodpulp, etc. The harvesting of a timber crops is an agricultural pursuit and remains so until, as stated by witnesses indicated, *supra*, it leaves the forest.

It is a matter of common knowledge, with which this member of the court is personally familiar, that there are those engaged in custom combining of small grain on a commercial basis. This includes both straight combining or swathing after which the grain is allowed to dry 2–4 days before combining with the use of a windrow pick-up. The custom combiners begin their journey in the grain fields of the Southern States during the early days of summer and continue north toward the Canadian border with their combining equipment. In addition many farmers having this equipment do combining for farm neighbors in local areas. The court could not conceive that defendant would seriously contend such custom combining of grain is not agricultural unless performed by the farmer with his own equipment on his own farm. By the same token the harvesting of trees by loggers does not make such action any less an agricultural pursuit.

Hence while logging as a commercial pursuit may be classified by the *Standard Industrial Classification Manual* separately, the harvesting of a timber crop either by a farmer or commercially constitutes, in the court's opinion, the harvesting of a crop. It is also to be noted as indicated, *supra*, that more than 70 percent of forest land is owned by private citizens and that 60 percent is in farm and other nonindustrial holdings. Accordingly the harvesting of trees is an agricultural pursuit in the same manner as the planting bullets utilized to plant trees were held to be agricultural implements. *Border Brokerage Company, Inc. v. United States*, C.D. 4089, 343 F.Supp. 1396, 65 Cust.Ct. 277 (1970), aff'd, C.A.D. 1058, 461 F.2d 1383, 59 CCPA 151 (1972).

Defendant argues further that the involved tractors are merely handling equipment and not tractors suitable for agricultural use. Since the pleadings make no claim under any provision for handling equipment this issue is not before the court for determination.

■ In any event since silviculture and the harvesting of the crop are agricultural pursuits, the skidding of logs to prepare them for market falls within the same category as the fruit boxes involved in *C. J. Tower & Sons v. United States*, 32 Cust.Ct. 54, C.D. 1579 (1954) and the farm cotton wagons in *Jones v. United States*, C.D. 2920, 265 F.Supp. 945, 58 Cust.Ct. 165 (1967).

In view of the foregoing, the court finds the tractors involved to be suitable for agricultural purposes. The claim of plaintiff is, therefore, sustained. Judgment will be entered accordingly.

---

* This work was cited in the *Tariff Classification Study Submitting Report* for TSUS as having a great influence on the arrangement of the new classification system.