662

The UNITED STATES, Appellant,

v.

NORMAN G. JENSEN, INC., Appellee.

Customs Appeal No. 76–16.

United States Court of Customs
and Patent Appeals.

March 10, 1977.

Rex E. Lee, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Chief Customs Section, Steven P. Florsheim, New York City, attys. of record, for appellant.

Barnes, Richardson & Colburn, New York City, attys. of record, for appellee, Joseph Schwartz and James S. O'Kelly, New York City, of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and PHILIP NICHOLS, Associate Judge, United States Court of Claims.

MILLER, Judge.

This appeal is from the judgment of the United States Customs Court, 76 Cust.Ct. ——, C.D. 4634, 408 F.Supp. 1379 (1976), sustaining appellee's claim that its merchandise is entitled to entry free of duty under item 692.30, Tariff Schedules of the United States ("TSUS"), instead of being subject to duty under item 692.35, TSUS, as classified. We affirm.

The pertinent statutory provisions are as follows:

PART 6.—TRANSPORTATION EQUIPMENT

\*  \*  \*  \*  \*  \*

Subpart B.—Motor Vehicles

\*  \*  \*  \*  \*  \*

Tractors (except tractors in item 692.40 and except automobile truck tractors), whether or not equipped with power take-offs, winches, or pulleys, and parts of such tractors:

| | | |
|---|---|---|
| 692.30 | Tractors suitable for agricultural use, and parts thereof . . . . . . . . . . . . . | Free |
| 692.35 | Other . . . . . . . . . . . . . . . . | 5.5% ad val. (as modified by T.D. 68–9) |

The merchandise consists of tractors, denominated " 'Tree Farmer' Skidder Machines" in appellee's protest and "Tree Farmer" by the manufacturer. They are predominantly[1] used to "skid"[2] logs from the site where trees are felled. Their design and construction make them particularly suitable for this use: four large rubber-tired wheels, four-wheel drive, articulated (hinged in the middle) steering, logging arch and winch, and high ground clearance.

The Customs Court held that the involved tractors are suitable for agricultural use for purposes of item 692.30, TSUS, on the basis that the harvesting of a timber crop is an agricultural pursuit and skidding of logs is a part of that harvesting.

Appellant's position is that this holding was erroneous, because: (1) even assuming that harvesting a timber crop is a part of forestry and that logging is a part of that harvesting, neither logging nor forestry comes within the common or commercial

---

1. Appellee's witness, Harold Murphy, president of an equipment company in Alabama, which had purchased approximately 300 Tree Farmer log skidders, testified that 95 percent of their use was for skidding logs.

2. "Skidding" is the dragging of a severed tree trunk (log) from the area in which the tree was growing to the "landing area"—a collection point for logs for their further transportation to a sawmill, papermill, or woodyard.

meaning[3] of the tariff term "agricultural"; (2) even if forestry is an agricultural pursuit, logging does not fall within the practice of forestry; and (3) Congress did not intend that logging tractors be included within the tariff provision for tractors suitable for agricultural use.

█ This court, in interpreting the words "suitable for use," has stated that

> suitability does not require that the merchandise be chiefly used for the stated purpose . . . but it does require more than " * * * evidence of a casual, incidental, exceptional, or possible use. * * * " . . . There must be a substantial actual use . . . ..

*Keer, Maurer Co. v. United States,* 46 CCPA 110, 114, C.A.D. 710 (1959). Thus, in determining whether the involved tractors are "suitable" for agricultural use, it is not necessary to consider their use in skidding logs in national forests (16 U.S.C. § 471 et seq.) or in state forests (16 U.S.C. § 567a et seq.). It would be sufficient if there is a substantial use in skidding logs on farms, including tree farms.[4] Two major lexicons that were contemporaneous to the enactment of the TSUS define "farm" as follows:

*Webster's Third New International Dictionary* (1961)

> *farm* . . . any tract of land (whether consisting of one or more parcels) devoted to agricultural purposes . . . ..

*Funk & Wagnalls New Standard Dictionary* (1963)

> *farm 1.* a tract of land . . . devoted to agriculture . . ..

In *Border Brokerage Co. v. United States,* 65 Cust.Ct. 277, 289, C.D. 4089, 343 F.Supp. 1396, 1404 (1970),[5] it was noted that "in 1941 a major timber company began the practice of tree farming which has become widespread." The opinion concluded:

> The cultivation of trees in a nursery or tree farm is clearly embraced within the meaning of agriculture as described in dictionaries and technical sources.

Appellee's witness, Harry Fisher, president of a logging company in Minnesota, defined a "tree farm" as "a plantation where trees have been planted for the production of timber." He testified that he had seen timber being harvested on a tree farm by Tree Farmer log skidders. Appellee's witness, Walter Furgat, president of a tractor equipment dealership in Vermont (its territory was Vermont, New Hampshire, Massachusetts, and Connecticut), which had sold some 75 new and 200 used Tree Farmer log skidders to "farmers and woodsmen," testified that over a ten-year period he had seen farmers use the skidders to bring out full-length trees from the woods on their own land (including dairy farms). Appellee's witness, Horace Johnson, an equipment dealer in South Carolina, who had sold around 150 Tree Farmer log skidders over a five-year period, testified that he had observed the skidders being used "every day"

---

**3.** Appellant calls attention to the presumption that the common and commercial meanings of "agricultural" are identical in view of the absence from the record of any indication to the contrary.

**4.** Appellant argues that the tariff term "agricultural" relates to farm equipment utilized by a farmer on a farm, for manipulating farm crops. However, we agree with the Customs Court that "it matters not who uses the Tree Farmer, that is, whether the trees are harvested by commercial loggers, farmers, or itinerant laborers." Appellant cites the quotation from *Staalkat of America, Inc. v. United States,* 59 Cust.Ct. 241, C.D. 3130 (1967), which appeared in this court's opinion in *Sortex Co. of North America v. United States,* 46 C.A.D. 951, 410 F.2d 443, 447, 56 CCPA 41 (1969), namely:

> [I]t appears that the provisions for free entry for agricultural implements, not provided for specially in tariff acts, include on-farm equipment for handling, packing, preparing for market, crops produced on the farm . . . ..

It is noted, however, that the Customs Court carefully used the word "include" and, thereby, did not necessarily restrict application of the provisions to such equipment.

**5.** *Aff'd,* C.A.D. 1058, 461 F.2d 1383, 59 CCPA 151 (1972) wherein this court stated that it was "in full agreement with the opinion of the Customs Court" (except for a minor point not here relevant). *Id.* at 152, 461 F.2d at 1384. Accordingly, quotations from that opinion accurately reflect this court's views.

and that their use included harvesting (skidding) the crop 10 or 15 years after planting. On cross-examination he stated: "We had a natural growth of timber years ago. Now, we have the farming of timber." None of appellant's witnesses contradicted the above-described uses, and its witness, Samuel Hudson, a County Forester for two counties under the Department of Forest and Parks of the State of Vermont, testified that he had seen a log skidder being used on a wood lot connected with a farm.

As noted by the Customs Court, *The Book of the States* (Council of State Governments, Lexington, Ky.) Vol. XX (1974–75) 488, shows that 60 percent of the Nation's commercial forest land "is in farms and other nonindustrial holdings involving over 4 million landowners." [6] The significance of farm forest land is shown by the report of the House Committee on Agriculture (H.R.Rep. No. 536, 81st Cong., 1st Sess. 10 (1949) U.S.Code Cong.Serv.1949, p. 2231), accompanying H.R. 2296, which was enacted October 26, 1949 (Pub.L. No. 392, 63 Stat. 909).[7] The report stated:

> Out of the 461,000,000 acres of commercial forest area in the United States, 344,973,000 acres are under private ownership. . . . [O]nly 50,672,000 acres of this privately owned land are in large forest tracts. . . . 261,385,000 acres are in small tracts of less than 5,000 acres each. These small tracts of forest land are owned by 4,225,000 different private owners, and the average size of the individual holdings is only 62 acres.

> The Forest Service estimates that approximately 85 percent of the privately owned forest land in the United States is in tracts of less than 100 acres each. Part of these tracts are in contiguous forest areas, but many others are in farm wood lots and small forest areas scattered throughout the farming regions of the United States. U.S.Code Cong.Serv.1949, p. 2238.

Two sections of the Act of October 26, 1949, which are pertinent to our analysis were codified as a part of Chapter 3—FORESTS; FOREST SERVICE; REFORESTATION; MANAGEMENT, under Title 16.—CONSERVATION. They provide as follows:

> § 567. Cooperation by Secretary of Agriculture with States in procuring, and so forth, forest-tree seeds and plants
>
> . . . .
>
> The Secretary of Agriculture is authorized and directed to cooperate with the various States in the procurement, production, and distribution of forest-tree seeds and plants, for the purpose of establishing forests, windbreaks, shelter belts, and farm wood lots upon denuded or nonforested lands within such cooperating States . . . to the end that forest-tree seeds or plants so procured, produced, or distributed shall be used effectively for planting denuded or nonforested lands in the cooperating States and growing timber thereon. . . .
>
> § 568. Cooperation by Secretary of Agriculture with States in establishing, and so forth, wood lots, shelter belts, windbreaks . . . .
>
> The Secretary of Agriculture is authorized and directed, in cooperation with the land grant colleges and universities of the various States or, in his discretion, with other suitable State agencies, to aid farmers through advice, education, demonstrations, and other similar means in establishing, renewing, protecting, and managing wood lots, shelter belts, windbreaks, and other valuable forest growth,

---

**6.** We also note an exhibit which is a copy of the April 1974 issue of FOREST FARMER, The Magazine of Forestry in Practice, published by the Forest Farmers Association, which is stated to be "a grassroots organization of timberland owners."

**7.** Amending the Act of June 7, 1924 (To provide for the protection of forest lands . . . and for other purposes in order to promote the continuous production of timber on lands chiefly suitable therefor), Pub.L. No. 270, 43 Stat. 654. The House Report was attached to and made a part of the report of the Senate Committee on Agriculture and Forestry (S.Rep. No. 611, 81st Cong., 1st Sess. (1949), U.S.Code Cong.Serv.1949, p. 2227).

and in harvesting, utilizing, and marketing the products thereof. . . .

Also to be noted is 16 U.S.C. § 562a, enacted July 3, 1926, as Pub.L. No. 488, 44 Stat. 838 ("An Act To authorize the establishment and maintenance of a forest experiment station in the Ohio and Mississippi Valleys"), which authorizes the Secretary of Agriculture, *inter alia,* "to determine the best methods for the growing, management, and protection of timber crops on forest lands and farm wood lots." The Senate Committee Report (S.Rep. No. 891, 69th Cong., 1st Sess. 1 (1926)), quoted a letter of approval of the bill (S. 3405) from the Acting Secretary of Agriculture, stating:

> Standing timber in the United States has been one of the most stable commodities in value, much more so in fact than of any other product of the land. Timber crops raised on farm woodlots should therefore be of great importance as a phase of diversified farming in making possible returns to the farmer during times of agricultural depression. I regard the establishment of an Ohio-Mississippi Valley station as of particular significance and importance for this reason. It offers the possibility in my judgment of constructive aid to agriculture of great importance.

The House Committee in its report (H.R. Rep. No. 1430, 69th Cong., 1st Sess. (1926)), quoted a similar letter from the Acting Secretary and said (p. 2): "The reason for setting this region [Ohio-Mississippi Valleys] off from the territories assigned to other stations is the occurrence of its forests almost exclusively in farm wood lots."

In view of the foregoing, we are satisfied that there is a substantial use of Tree Farmer log skidders in skidding logs on farms, including tree farms.

---

**8.** *Webster's, supra,* defines "tree" as: "*1 a:* a woody perennial plant . . . .."

**9.** Appellant argues that in agriculture a "crop" is realized about once a year, while in forestry a stand of trees destined for the lumber or pulp industry requires a much greater period of time

■ The key issue is whether such use is "agricultural" for purposes of item 692.30, TSUS. The two previously-cited major lexicons contain the following definitions:

> *Webster's Third New International Dictionary* (1961)
>
> *agriculture*—*a :* the science or art of cultivating the soil, harvesting crops, and raising livestock: tillage, husbandry, farming *b :* the science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing).
>
> *Funk & Wagnalls New Standard Dictionary* (1963)
>
> *agriculture* . . . *1.* The cultivation of the soil for food-products or any other useful or valuable growth of the field or garden; tillage; husbandry; also, by extension, farming, including any industry practiced by a cultivator of the soil in connection with such cultivation, as forestry, fruit-raising, breeding and rearing of stock, dairying, market-gardening, etc.

It is to be noted that Webster's definition includes "harvesting crops" and "the production of plants," which includes trees.[8] Taken in context, "crops" obviously relates to "plants."[9] *Funk & Wagnalls'* definition includes forestry. The tariff term "agricultural" is old, going back at least to its use in the phrase "Agricultural implements," which appeared under the Free List in paragraph 391 of the Tariff Act of 1913, Pub.L. No. 16, 38 Stat. 114, 152. Contemporaneous editions of the above-cited major lexicons defined "agriculture" as follows:

> *Webster's New International Dictionary* (1913)
>
> *agriculture* . . . Art or science of cultivating the ground, including harvesting of crops and rearing and man-

to mature. However, the cited lexicons draw no distinction on the basis of length of time for a crop to mature; moreover, as pointed out in Wackerman, Hagenstein & Michell, *Harvesting Timber Crops* 7 (1966), "most forests are managed for an even harvest flow year-by-year."

agement of live stock; tillage; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for man's use. In this broad use it includes farming, horticulture, and forestry . . . .

*Funk & Wagnalls Standard Dictionary* (1913)

agriculture [definition identical to that in 1963 edition of *New Standard Dictionary*]

Although the word "forestry" was subsequently dropped from the *Webster's* definition, while *Funk & Wagnalls* continued to include it, "harvesting crops" and "the production of plants" remained in the definition.[10]

▮▮ That Congress has long intended "agriculture" to be most broadly defined is shown by the Act of May 15, 1862, ch. 72, 12 Stat. 387, establishing the Department of Agriculture, which provided, *inter alia*:

That there is hereby established at the seat of Government of the United States a Department of Agriculture, the general designs and duties of which shall be to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture in the most general and comprehensive sense of that word . . . .

Similar language appears in the law today (7 U.S.C. § 2201). The intent that "agriculture" be most broadly defined is further shown by 7 U.S.C. § 427, enacted August 14, 1946, as Pub.L. No. 733, 60 Stat. 1082 ("An Act to Provide for further research into basic laws and principles relating to agriculture . . ."), which provides:

It is hereby declared to be the policy of the Congress to promote the efficient production and utilization of products of the soil as essential to the health and welfare of our people and to promote a sound and prosperous agriculture and rural life as indispensable to the maintenance of maximum employment and national prosperity. It is also the intent of Congress to assure agriculture a position in research equal to that of industry which will aid in maintaining an equitable balance between agriculture and other sections of our economy. For the attainment of these objectives, the Secretary of Agriculture is authorized and directed to conduct and to stimulate research into the laws and principles underlying the basic problems of agriculture in its broadest aspects, including . . . research relating to the conservation, development, and use of land, forest, and water resources for agricultural purposes . . . .

Such Congressional intent is similarly shown by 7 U.S.C. § 361b, enacted August 11, 1955, as Pub.L. No. 352, 69 Stat. 671 ("An Act . . . relating to the appropriation of Federal funds for the support of agricultural experiment stations . ."), which provides, in part, as follows:

It shall be the object and duty of the State agricultural experiment stations through the expenditure of the appropriations hereinafter authorized to conduct original and other researches, investigations, and experiments bearing directly on and contributing to the establishment and maintenance of a permanent and effective agricultural industry in the United States, including researches basic to the problems of agriculture in its broadest aspects . . . .

See *United States v. S. S. Perry*, 25 CCPA 282, 286, T.D. 49395 (1938). Further evidencing this intent and, in our view, deci-

---

10. Appellant points out that, of the fourteen witnesses who testified, four were employed as loggers and "were in agreement that, as loggers, they did not work on farms and did not consider themselves to be farmers." From this, appellant argues that "the people engaged in logging as a commercial endeavor do not consider their work to be agricultural in nature." However, such testimony on a question of law can hardly be considered binding on this court. *United States v. O. Brager-Larsen*, 36 CCPA 1, 3, C.A.D. 388 (1948). The same is to be said for the testimony of one of appellant's witnesses, a union official, that unionized skidder operators are members of the International Woodworkers of America, which does not represent agricultural or farm workers.

sive of the key issue [11] in this case is the following statement in the previously-cited 1949 House Committee on Agriculture Report, *supra* at 10–11:

> The time has come, however, when we must depend for much of our future timber supplies on these *small forests and woodlands where trees are planted and harvested just as any other crop.* To assure ourselves an adequate supply of timber products, *the farmers who own these small areas of woodland* must be convinced that trees can be produced as a profitable crop to them, and assist[ed] in establishing this type of forest.

> .   .   .   .   .

> The general lack of productive management of small forest properties is the core of this Nation's forest problem. Three fourths of our commercial forest land is privately owned; 76 percent of this is in more than 4,000,000 small properties averaging only 62 acres each; *about one-half of these small-area forest lands are on farms* .   .   ..

> .   .   .   .   .

> Under the authority of this section, extension foresters working through the State agricultural colleges and in co-operation with the county agents, will carry on a forestry educational program. *Working with farmers and farm groups,* they will perform the important function of interesting farmers in forestry and sound forest management, showing them how *timber can be made a profitable crop for them* and how it fits into their soil conservation and *general farm program,* and persuading farmers to handle their timber crop with the same businesslike methods they apply to other crops. [Emphasis supplied.]

■ In light of the long-standing intent of Congress that "agriculture" be most broadly defined and of the legislative history of current laws showing that Congress has, since well before enactment of the TSUS, regarded the harvesting of a timber crop on a farm to be like any other crop in a general farm program, we hold that the use of Tree Farm log skidders in skidding logs on farms, including tree farms, is part of the process of harvesting timber crops and that such use is "agricultural" for purposes of item 692.30, TSUS.

■ In urging that "Congress did not intend logging tractors to be included within the tariff provision for tractors suitable for agricultural use," appellant relies on the *Standard Industrial Classification Manual* (1957) ("SICM") showing that logging activities are categorized separately (under Major Group 24, Lumber and wood products) from agricultural activities (under Major Group 01); also that logging equipment is an exemplar under Group No. 353 for Construction, Mining, and Materials Handling Machinery and Equipment, whereas Farm Machinery and Equipment is covered separately under Group No. 352. In this connection, we note the following statement in the *Tariff Classification Study, Submitting Report* 8 (1960):

> The "Brussels Nomenclature" and the "Standard Industrial Classification Manual" exerted the greatest influence [from among the number of tariff, commodity, and industrial classification systems studied] on the arrangement of the proposed revised schedules.

However, we agree with the Customs Court's statement in *M. Hohner Inc. v. United States,* 63 Cust.Ct. 496, 500–01, C.D. 3942 (1969), regarding the usefulness of the

---

11. The record clearly supports a conclusion that the skidding of logs is a part of the process of harvesting a timber crop. Although appellant argues that log skidding is "logging" and that "logging" is a function of the lumbering industry, this would not make the function any less "agricultural." Nor does the fact that harvesting a timber crop on a farm is a forestry practice make such harvesting any the less

"agriculture." Long ago this court observed that " 'agriculture' in its broad application may extend into and include elements of *allied* industries and pursuits .   .   .." *United States v. Boker & Co.,* 6 Ct.Cust.Appls. 243, 244, T.D. 35472 (1915). In *Border Brokerage, supra,* 65 Cust.Ct. at 286, 343 F.Supp. at 1402, it was stated that lumber is "admittedly an agricultural product."

Brussels Nomenclature (which is equally applicable to the SICM):

It is true that the *Brussels Nomenclature* is a useful and helpful source of legislative history with respect to the tariff schedules when a nexus can be found between it and the tariff schedule provisions by the use of identical or similar phraseology. . . . On the other hand where the order, language and phraseology of *Brussels* differ from the provisions of the tariff schedules, *Brussels* does not serve as a guide to the intention of Congress.

*Cf. F. L. Smidth & Co. v. United States,* C.A.D. 958, 409 F.2d 1369, 1375, 56 CCPA 77, 83–84 (1969). We find no "nexus" (and appellant has not shown any) between the cited groupings in the SICM and the TSUS. Indeed, the TSUS items in issue (692.30 and 692.35) both appear under Subpart B.—Motor Vehicles, in Part 6, Transportation Equipment, of Schedule 6, Metals and Metal Products. Although logs and timber (item 200.35) are classified in the TSUS under Schedule 2, Wood and Paper, and not under Schedule 1, Animal and Vegetable Products, this does not evidence an intention that logs should be considered other than an agricultural product—any more than the classification of wool, cotton, and other vegetable fibers under Schedule 3, Textile Fibers and Products, indicates that these products should be so considered. Accordingly, appellant's reliance on the SICM is misplaced.

The Tree Farmer log skidders are "suitable for agricultural use" for purposes of item 692.30, TSUS.

The judgment of the Customs Court is *affirmed.*

AFFIRMED.