**NIPPON KOGAKU (USA),
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 76–2–00521.**

United States Court of International Trade.

June 4, 1981.

Serko & Simon, New York City (Joel K. Simon, New York City, on the brief), for plaintiff.

Thomas S. Martin, Acting Asst. Atty. Gen.; Joseph I. Liebman, New York City, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Jerry P. Wiskin, New York City, on the brief), for defendant.

BOE, Judge:

The subject merchandise in the above-captioned action, described in the special customs invoice as a "ZOOM PHOTO SLIT–LAMP MICROSCOPE, BASIC UNIT," was imported from Japan and entered at New York in July 1972 and January 1975. Upon liquidation the subject merchandise was classified under item 709.-05, TSUS, providing:

Schedule 7, Part 2, Subpart B

Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and ophthalmic instruments), and parts thereof:
    Optical instruments and appliances, and parts thereof:
        Mirrors and reflectors ..............................
        Binocular loupes for eye examinations .................

709.05        Other ...........................................25% ad val.

The plaintiff contests the liquidated classification, claiming that the imported merchandise is properly classifiable under item 708.73, providing:

Schedule 7, Part 2, Subpart A

Compound optical microscropes; electron, proton, and similar microscopes and diffraction apparatus; all the foregoing whether or not provided with means for photographing or projecting the image; frames and mountings for the foregoing articles, and parts of such frames and mountings:
Compound optical microscopes:
Not provided with means for photographing or projecting the image:

\* \* \* \* \* \* \*

708.73          Valued over $50 each ..........................22.5% ad val.

The subject merchandise is an optical instrument used by ophthalmologists and optometrists to assist in the examination and the diagnosis of abnormalities or diseases of the eye.

The principal components of the imported merchandise are (1) the "main unit," (2) a cross-slide table which contains the power supply and to which the main unit is attached by a swivel arm and (3) a chin rest assembly permitting the patient's head to be placed in the proper position for an eye examination. The "main unit" consists of two interconnected systems: (a) an observation system employing twin objective lenses which provide a magnified image of the object viewed and twin eyepieces which further magnify the image, and (b) a slit-lamp system which directs a beam of light into the eye thereby sectioning the eye and permitting a view of various portions thereof, such as—the cornea, vitreous humor and aqueous humor.

The thrust of plaintiff's argument is that in construction and operation, the subject merchandise is a compound optical microscope, properly classifiable under item 708.73, TSUS, and, consequently, specifically excluded from classification as an ophthalmic instrument under item 709.05, TSUS, by virtue of headnote 1(ii) of Schedule 7, part 2, subpart B, providing:

Subpart B headnote:
  1. This subpart does not cover—

\* \* \* \* \* \*

(ii) spectacles, lorgnettes, goggles and similar articles; *microscopes* and diffraction apparatus (*see subpart A of this part*); [Emphasis supplied.]

For the reasons hereinafter stated, this court concludes that the subject merchandise is not a compound optical microscope within the meaning of the tariff schedules, and, therefore, not properly classifiable under item 708.73, TSUS, as claimed by plaintiff.

Tariff provisions are presumed to have been framed so as to classify articles according to the general usage and denomination of the trade of which they are a part. *Nylos Trading Co. v. United States,* 37 CCPA 71, C.A.D. 422 (1940). In determining the common and/or commercial meaning of tariff terms, the court may be aided by the evidence submitted as well as by independent examination of standard dictionaries and scientific authorities. Webster's Third New International Dictionary 1429 (1966) provides this definition of "microscopes":

microscope ... 1: an optical instrument consisting of a lens or combination of lenses for making enlarged images of minute objects;

A "compound microscope" is defined as follows:

compound microscope: a microscope consisting of an objective and an eyepiece mounted in a drawtube and focused by means of screw arrangements [At 467.]

Supplementing these very general descriptions of the terms "microscope" and "compound microscope," competent evidence has been submitted that in commercial and trade usage, the term "compound optical

microscope" does not include the subject merchandise.

The evidence submitted by affidavit and deposition establishes that the subject merchandise and instruments manufactured by other companies, similar in purpose, function and description, are marketed in the United States as ophthalmic instruments, whereas "compound microscopes" are marketed as "microscopes." It likewise appears without contradiction that the industry, as well as ophthalmologists and optometrists, principal users of the article, know and refer to it as a slit-lamp microscope or a slit-lamp, not as a "compound microscope." Vilardi Deposition of May 15, 1980 at 8–9; Bannon's Affidavit at ¶¶ 8–10, 12–14; Tackaberry's Affidavit at ¶¶ 11–12, 14–17.

In light of the commercial and trade designation of the subject merchandise as contrasted with the generalized dictionary definition of the term "compound microscope," the use of legislative history and extrinsic aids is deemed proper and warranted to ascertain the legislative intent embodied in the tariff schedule providing for "compound optical microscopes." *See United States v. Durst Mfg. Co.*, 46 CCPA 74, C.A.D. 700 (1959).

The predecessor statutory provisions to item 709.05, TSUS, and item 708.73, TSUS, were paragraphs 228(a) and 228(b) of the Tariff Act of 1930, respectively providing:[1]

PAR. 228. (a). Spectrographs, spectrometers, spectroscopes, refractometers, saccharimeters, colorimeters, prism-binoculars, cathetometers, interferometers, haemacytometers, polarimeters, polariscopes, photometers, ophthalmoscopes, *slit lamps, corneal microscopes*, optical measuring or optical testing instruments, testing or recording instruments for ophthalmological purposes, . . .

(b) Azimuth mirrors, parabolic or mangin mirrors for searchlight reflectors, mirrors for optical, dental, or surgical purposes, photographic or projection lenses, sextants, octants, opera or field glasses (not prism binoculars), telescopes, *microscopes*, all optical instruments, . . . not specially provided for, . . . [Emphasis supplied.]

From the brief reference contained in the affidavit of Mr. Bannon, accompanying defendant's motion for summary judgment, it appears that the slit-lamp microscope manufactured by Nikon, the subject merchandise in this action, is an improved version of the corneal microscope used in the early 1920's, in that it now has the slit light source permanently made a part of the instrument. Bannon's Affidavit at ¶ 11. The meager record as to the meaning of the terms "slit-lamps" and "corneal microscopes" as well as the lack of any explanatory definition contained in the Tariff Act of 1930 and its legislative history, has caused the court to initiate further investigation with respect thereto.

The multivolume work, Systems of Ophthalmology, is illuminating in providing a history of the slit-lamp and corneal microscope and their relationship to modern ophthalmic instruments:

### THE SLIT–LAMP

The slit-lamp together with the corneal microscope forms a system of focal illumination of extreme accuracy and mobility which has done more to elucidate the finer changes occurring in ocular disease than any other method. With its evolution the name of Gullstrand will always be associated.

\* \* \* \* \* \*

THE CORNEAL MICROSCOPE. A binocular loupe which is held by the observer, if it is to provide sufficient magnification, presents the insuperable disadvantage of unsteadiness: for this reason it was discarded by Gullstrand as soon as he had evolved a system of illumination sufficiently powerful and susceptible of control to make high magnifications practicable. A microscope had been intro-

1. Tariff Classification Study (Volume 9), Explanatory and Background Materials: Schedule 7 at 100, 102.

duced by Abbé in 1881 and was adapted by Siedentopf, wherein the light from a single objective was distributed between two oculars by prisms to obtain a stereoscopic effect (the bi-tubus microscope); ... A better instrument was the corneal microscope originally devised by Czapski (1897–99) and developed by Zeiss... Originally it was used with the inadequate illumination provided by a diffusely radiating electric lamp fixed above it, but when combined with the slit-lamp of Gullstrand it formed an exceedingly useful observation system.

The Czapski-Zeiss corneal microscope was binocular, and an erect image with a full stereoscopic effect was obtained by a system of Porro prisms with four reflections, which also allowed the eyepieces to be adapted to suit the interpupillary distance of the observer. The instrument was extremely mobile, allowing linear movements in the sagittal, frontal, and vertical directions, and rotations around the fronto-horizontal and vertical axes. On these principles all subsequent corneal microscopes have been based.

THE SLIT–LAMP. In 1911 Allvar Gullstrand first demonstrated a model of the slit-lamp. It was composed essentially of a Nernst lamp, the luminous filament of which was focused upon a slit by a collecting system of lenses.

\* \* \* \* \* \*

As time has gone on, many models of the slit-lamp have been evolved, but the principle of all of them is based on the original model of Gullstrand ... A considerable advance was introduced in the Bausch and Lomb slit-lamp by Koeppe in 1923 which provided co-axial rotation of the illumination system and the micro-

scope, an idea improved by Fincham (1924) who linked the two so that each remained in focus with the other ... A second innovation was due to Comberg (1933) whereby (in the Zeiss instrument) the illumination was set vertically and the beam deflected horizontally into the eye by a prism in such a way that it could be made nearly co-axial with the microscope, both moving about a single common axis... Finally, in 1937, Goldmann (in a Haag-Streit model of the Gullstrand type of instrument with its horizontal optical system) added a joy-stick control for fine simultaneous adjustment of the lamp and the microscope. [Duke-Elder, Systems of Ophthalmology, Volume VII at 248–49, 252 (1962).]

From the foregoing it is clear that the corneal microscope and the slit-lamp illumination source were utilized together in making eye examinations from an early date and that the two devices were physically linked to each other by the year 1924. Though many innovations and improvements have been made since the slit-lamp illumination source and corneal microscope were first used together, the Nikon slit-lamp microscope in issue herein is apparently based on that original model.[2]

Insight into the legislative intent with respect to the effect to consolidate related medical instruments and appliances used for diagnostic and treatment purposes is provided in the Explanatory Notes contained in the Tariff Classification Study (Volume 9), Schedule 7, Part 2 at 144–45:

*Subpart B—Medical and Surgical Instruments and Apparatus*

This subpart covers a wide variety of instruments and appliances used general-

---

**2.** It is noteworthy that the use of both of the terms "slit lamp" and "corneal microscope" has survived until today. A recent volume of an optical instruments trade publication defined "ophthalmic instruments" as "[a] family of specialized instruments used by ophthalmologists and optometrists to study a patient's eyes and prescribe spectacles. It includes ... the Slit lamp and Corneal Microscope to observe small regions of the cornea that may be opaque or may scatter light." The Optical In-

dustry & Systems Purchasing Directory, Book 2 at D–86 (26th ed. 1980). The 1972 Standard Industrial Classification Manual lists both "Corneal microscopes" and "Slit lamps (ophthalmic goods)" under Industry No. 3841, "Surgical and Medical Instruments and Apparatus."

Interestingly, Topcon, a distributor of instruments similar to the subject merchandise, markets its slit lamp microscope as a "Slit Lamp Corneal Microscope."

ly in professional practice for diagnosis, prevention, and treatment of diseases, the correction of deformities and defects, the repair of injuries, etc. These articles are presently dutiable at a number of different rates in a number of widely separated paragraphs in seven of the present tariff schedules. In assimilating the various provisions for these closely related instruments and appliances into this subpart, articles imported in significant quantities have been provided for wherever possible at the existing rates of duty. However, in some instances the rates reflect estimated weighted averages of the presently effective duties.

Items 709.01 through 709.05 cover optical instruments and appliances. Item 709.01 covers principally medical and surgical mirrors and reflectors, now dutiable under paragraph 228(b), whether or not such mirrors and reflectors are used for reflecting images or for reflecting light on objects. The current rate of duty is proposed. The binocular loupes provided for in item 709.03 are currently dutiable under paragraph 228(b) as microscopes. The proposed rate for such loupes is the current rate of duty applicable to most imports of these articles. Item 709.05 covers all other optical instruments and appliances. Included among such instruments would be ophthalmoscopes, orthoptic and sight testing apparatus, cases of trial lenses and spectacles, similar articles all of which are currently dutiable under paragraph 228(a). The existing rate of duty for such articles is reflected in item 709.05.

By specifically excluding "compound microscopes" pursuant to headnote 1(ii), *supra*, which under paragraph 228(b) of the Tariff Act of 1930 were classified as "microscopes," Congress has further evidenced its intent to provide that the provision for microscopes corresponds with the trade and commercial meaning therefor. As further noted in the Tariff Classification Study, *supra*, at 143, the following explanation is contained:

With the elimination of the simple magnifiers and the like, the provision for microscopes corresponds closely with trade designations.

In the Summaries of Tariff Information, Volume 2, Part 2 at 112 (1948), the following comment is made with respect to the scope of the microscope provision in paragraph 228(b), Tariff Act of 1930:

The microscopes considered herein are both the general-purpose instruments and the highly specialized research types used in industrial, scientific and educational laboratories.

The comment relating to paragraph 228(a) at page 117, states:

This summary considers (1) instruments and apparatus for the examination, diagnosis, and measurement of the human eye;

The Summaries of Trade and Tariff Information, Schedule 7, Volume 2 at 39 (1970), provides this description of the types of microscopes classified under items 708.-71–.76, .78, TSUS:

The optical, electron and proton microscopes are of two types: general purpose (primarily optical), used by amateurs, teachers, etc.; and specialized research types, used by industrial, scientific, and educational laboratories for the study of minute particles of matter in such fields as botany, chemistry, medicine, metallurgy, and food production.

The 1970 Tariff Summaries provides this description of the articles classified under items 709.01–.27, TSUS, at page 59:

The articles considered in this summary include a wide variety of instruments and appliances used in the professional practice of medicine and dentistry for the prevention, diagnosis, and treatment of diseases and injuries and the correction of physical deformities and defects of the human body.

A comparison of the 1948 Tariff Summaries, relating to the Tariff Act of 1930, and the 1970 Tariff Summaries, relating to the Tariff Schedules of the United States, reveals that the administrative practice has consistently been to classify only general-purpose instruments and highly specialized

research-type instruments for industrial, scientific and educational laboratories as "microscopes," and to exclude from the scope of that term, those specialized diagnostic instruments such as the subject merchandise, which are utilized by medical practitioners to make physical examinations to detect diseases and defects of the body.[3]

The Tariff Classification Study, Submitting Report at 8 acknowledges:

> The *'Brussels Nomenclature'* and the *'Standard Industrial Classification Manual'* exerted the greatest influence on the arrangement of the proposed revised schedules. [Emphasis supplied.]

Thus, the Brussels Nomenclature is a useful and helpful source of legislative history when a nexus can be found between it and the tariff schedules by the use of identical or similar phraseology. *See United States v. Norman G. Jensen, Inc.,* 64 CCPA 51, 550 F.2d 662 (1977). In the instant action, the relevant provisions in the tariff schedules and the Brussels Nomenclature (1955) are very similar with respect to the scheme of classification as well as phraseology. The following Brussels headings at page 178 have a close nexus to the superior heading to items 708.71–.82, TSUS:

> 90.11—Microscopes and diffraction apparatus, electron and proton.
>
> 90.12—Compound optical microscopes, whether or not provided with means for photographing or projecting the image.

The following Brussels heading at page 179 is almost identical to the superior heading to items 709.01–.27, TSUS:

> 90.17—Medical, dental, surgical and veterinary instruments and appliances (including electro-medical apparatus and ophthalmic instruments).

The Explanatory Notes to Brussels heading 90.12 at page 1035 delineate the scope of the "Compound optical microscopes" provision:

The present heading covers microscopes as used by amateurs, teachers, etc., and those for industrial use or for research laboratories;

The Explanatory Notes to heading 90.17 at page 1049 provide:

> This heading covers a very wide range of instruments and appliances which, in the vast majority of cases, are used only in professional practice (e. g., by doctors, surgeons, dentists, veterinary surgeons, midwives, etc.), either to make a diagnosis, or to prevent or treat an illness, . . .
>
> The heading does not cover;
>
> \*    \*    \*    \*    \*    \*
>
> (ij) Microscopes, etc., of heading 90.-11 or 90.12.

The Explanatory Notes continue at page 1051 stating that heading 90.17 does cover ophthalmic instruments used for diagnostic purposes. The Brussels Nomenclature, and the Explanatory Notes thereto which closely parallel the language used in the 1948 Summaries and 1970 Summaries, thus well serve to evidence Congressional intent to limit the scope of the term "compound optical microscope," as used in the tariff schedules, to general-purpose microscopes and those designed for industrial use or research laboratories and to exclude from the term "compound optical microscope," those specialized instruments used by medical practitioners to examine parts of the body for the purpose of diagnosing diseases or abnormalities.

Further cogent evidence that Congress did not intend to classify the subject merchandise as a "compound optical microscope" under item 708.73, TSUS, but rather as an ophthalmic instrument properly classifiable under item 709.05, TSUS, is provided in the Standard Industrial Classification Manual (SICM) (1957). The SICM, indeed, is closely similar in classification order and phraseology to the relevant tariff schedule provisions and is therefore useful as a source of legislative history. The SICM provisions state in relevant part:

---

**3.** Although the long standing administrative practice so established by the Tariff Summaries is not evidence of Congressional intent, it is entitled to be given weight by the court. *Ha-* *waiian Motor Co. v. United States,* 617 F.2d 286 (Cust. & Pat.App.1980); *The Englishtown Corp. v. United States,* 64 CCPA 84, 553 F.2d 1258 (1977).

| Group No. | Industry No. | |
|---|---|---|
| 383 | | **OPTICAL INSTRUMENTS AND LENSES** |
| | 3831 | Optical instruments and lenses |

Establishments primarily engaged in the production of optical lenses and prisms, and in manufacturing optical instruments such as microscopes, telescopes, field and opera glasses; . . .

\*     \*     \*     \*     \*     \*     \*

| 384 | | **SURGICAL, MEDICAL, AND DENTAL INSTRUMENTS AND SUPPLIES** |
|---|---|---|
| | 3841 | Surgical and medical instruments and apparatus |

Establishments primarily engaged in manufacturing medical, surgical, *ophthalmic,* and veterinary *instruments and apparatus.* [Emphasis supplied.]

---

The index to the SICM states at page 368 that "Microscopes, corneal" are classified under Industry No. 3841 and that "Microscopes, except corneal" are classified under Industry No. 3831. The index further provides at page 401 that "Slit lamps (ophthalmic goods)" are likewise classified under Industry No. 3841. Clearly, the subject merchandise in this action would have been classified under SICM Industry No. 3841, "Surgical and medical instruments and apparatus" and not as a "microscope" under Industry No. 3831.

From the evidence adduced, and the application of the relevant principles of law, the court must conclude that Congress did not intend that the subject merchandise be classified as a "compound optical microscope" under item 708.73, TSUS, but rather as an ophthalmic instrument under item 709.05, TSUS.

The classification of the subject merchandise as made upon liquidation, therefore, must be affirmed.

Let judgment be entered accordingly.