**The UNITED STATES, Appellant,**

v.

**BORDER BROKERAGE CO., INC., Appellee.**

**Appeal No. 82–15.**

United States Court of Appeals, Federal Circuit.

May 11, 1983.

Robert H. White, New York City, for appellant. With him on the brief were J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., David M. Cohen, New York City, Director and Joseph I. Liebman, New York City, Atty. in Charge, Intern. Trade Field Office.

Stephen Spraitzar, San Francisco, Cal., for appellee. With him on the brief was George R. Tuttle, San Francisco, Cal.

Before FRIEDMAN, BENNETT and MILLER, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal by the United States from a judgment of the United States Court of International Trade determining that certain imported wire rope fittings should have been admitted duty-free as "agricultural . . . implements" rather than subjected to duty as "articles of iron or steel." We affirm.

## I.

Wire rope fittings are used with wire rope as couplings between an object and the rope. The fittings here involved are used in the hauling of cut timber. The wire rope is wrapped around the log, and the fittings are used as couplings to secure the rope to the log. The other end of the rope is then attached to a power source (i.e., a tractor), which pulls the logs to their destination.

When the fittings were imported, the Customs Service classified them as "Articles of iron or steel . . ." under item 657.20 of the Tariff Schedules of the United States, 19 U.S.C. § 1202 (1976), and assessed a duty. The appellee protested this determination, and contended that the articles were entitled to duty-free entry as "agricultural and horticultural implements not specially provided for . . ." under item 666.00. The Service denied the protest.

The appellee filed suit in the Court of International Trade, challenging the characterization of the fittings as iron or steel articles. After a trial at which five witnesses testified and numerous exhibits were received, the court held that the fittings should have been classified as agricultural implements and admitted duty-free.

The court ruled that under *United States v. Norman G. Jensen, Inc.,* 550 F.2d 662, 64 CCPA 51 (Cust. & Pat.App.1977), "logging is an agricultural pursuit and, therefore, the merchandise is agricultural implements." The court interpreted *Jensen* as holding that "the growing of trees and the harvesting of them is an agricultural pursuit . . . ." The court concluded that the record showed that the fittings were "chiefly used in agriculture" i.e., "logging applications," and that they therefore were properly classifiable as agricultural implements "under item 666.00 since it is obvious that they are 'implements.' "

## II.

A. The government correctly points out that the Court of International Trade was mistaken in its view that *Jensen* held that "the growing of trees and the harvesting of them is an agricultural pursuit." The holding in *Jensen* was much narrower.

The question in *Jensen* was whether a particular kind of tractor used to "skid" (i.e., drag) logs was within the Tariff Schedule item covering "tractors suitable for agricultural use." The court held that "the use of Tree Farm log skidders in skidding logs on farms, including tree farms, is part of the process of harvesting timber crops and that such use is 'agricultural' for purposes of [Tariff Schedule] item 692.30 . . . ." 550 F.2d at 668, 64 CCPA at 59. The classification in *Jensen* was based on actual use. The holding in *Jensen* was only that the use of that tractor for dragging logs "on farms, including tree farms" was an agricultural use of the tractors; the court did not make the broader holding that the Court of International Trade ascribed to it.

B. The fact that the Court of International Trade relied upon an impermissibly broad reading of *Jensen* does not necessarily mean that its decision was erroneous. To the contrary, we conclude that the rationale of *Jensen,* if not its actual holding, covers this case and requires affirmance of the Court of International Trade's ruling that these wire rope fittings are agricultural implements within the meaning of tariff item 666.00.

In holding that the use of the tractors "on farms, including tree farms," was "agricultural," the court in *Jensen* relied upon the "long-standing intent of Congress that

'agriculture' be most broadly defined and ... the legislative history of current laws showing that Congress has, since well before enactment of the [Tariff Schedules of the United States], regarded the harvesting of a timber crop on a farm to be like any other crop in a general farm program ...." 550 F.2d at 668, 64 CCPA at 59.

The record here shows that "tree farms" are privately held timber lands that the state has certified as being in that category. The certification means only that the timber land is managed scientifically, with an emphasis on fire prevention and reforestation after the trees have been felled.

While federally owned forests cannot be "tree farms" because they are not state certified, the "tree farm" concept is nonetheless applicable to the timber operations on them. Two forestry experts (one of whom participated in the creation of the "tree farm" concept and the development of federal laws pertaining to the management of national forests) testified that government-owned timber lands are managed in virtually the same way as tree farms. The government did nothing at trial, either by cross-examination or the introduction of contrary evidence, to impeach that evidence or cast any doubt on its correctness.

The appellee also introduced evidence, similarly unrebutted, that of the forest land in the United States, 19 percent is commercial land in the national forests that is "managed" "[e]xactly" "like tree farms," 32 percent is comprised "for the most part" of tree farms owned by the forest industry, and 40 percent is private farms and other land that includes tree farms and forest lands "managed" "[v]ery similar" to tree farms. Thus, although the record does not show the exact portion of the nation's forest lands that are either tree farms or are managed the same as tree farms, it does indicate that substantially more than half of forest lands fall into this category.

Since (1) the majority of the timber lands upon which these wire rope fittings are used are either tree farms or operated in

the same way as tree farms, and (2) the existence *vel non* of a tree farm depends upon how it is operated, we conclude that under *Jensen* the use of these fittings is "agricultural." As *Jensen* recognized, Congress intended the term "agricultural" in the Tariff Schedules to have a broad meaning. It is consistent with this intention to treat as "tree farms" forest lands that are operated in the same way as tree farms, even though technically they are not tree farms. "[A]gricultural free list provisions ... which were intended to benefit agriculture" are given "a very broad and liberal construction so that the evident purpose of Congress especially to favor agriculture might be carried out." *United States v. S.S. Perry,* 25 CCPA 282, 286 (Cust. & Pat. App.1938).

The government attempts to distinguish national forest land from tree farms on the ground that timber is removed from the former land for non-agricultural purposes (i.e., the creation of roads and recreational areas). The record refutes this argument. It indicates that roads are cut on both tree farms and national forests in order to gain access to areas where timber is to be cut and hauled away. These activities are directly related to harvesting timber because "[e]fficient harvesting of the timber by logging requires a carefully planned network of permanent forest highways together with many temporary woods roads or trails over which the logs are hauled out." 9 *Encyclopaedia Britannica* 619 (1973).

The record does not show that substantial timber cutting is done in national forests for recreational purposes or to clear land for power transmission lines. To the contrary, the record indicates that the bulk of timber cutting in national forests (as on tree farms) is done as part of an organized harvesting to satisfy the public demand for timber products.

C. The Court of International Trade correctly held that the fittings are agricultural "implements" under tariff item 666.-00. The Court of Customs and Patent Ap-

peals has interpreted the term "implement" broadly. In *United States v. S.S. Perry, supra,* the court held that celluloid leg bands, used chiefly to identify chickens, were agricultural implements. *See also Wilbur-Ellis Co. v. United States,* 26 CCPA 403 (1939) (steel bale ties); *Border Brokerage, Inc. v. United States,* 343 F.Supp. 1396 (Cust.Ct.1970), *aff'd,* 461 F.2d 1383 (Cust. & Pat.App.1972) (plastic planting bullets used for planting and growing trees are "agricultural or horticultural implements" under item 666.00). The wire rope fittings here involved are "agricultural implements" because their principal use is in connection with the agricultural activity of harvesting timber on land that is operated as a tree farm. *See* discussion *infra.*

### III.

The United States contends, however, that the articles here involved are part of a broad class of wire rope fittings used in various industries, and that since the chief use of this broad class of articles is not agricultural, they cannot be characterized as agricultural implements. It relies upon headnote 10(e)(i) of the Tariff Schedules, "General Headnotes and Rules of Interpretation," which provides that "a tariff classification controlled by use ... is to be determined in accordance with the use in the United States ... of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined."

The factors that are pertinent in determining a class of articles (*see United States v. Carborundum Co.,* 536 F.2d 373, 377, 63 CCPA 98, 102 (Cust. & Pat.App.1976)) indicate that these wire rope fittings are a separate class, the chief use of which is agricultural. Although wire rope fittings are used in various industries (i.e., marine construction, oil rigging, mining, telecommunications, and logging), the record shows that the fittings used in logging have different physical characteristics from other

fittings, and are tailored to meet the specific needs of the logging industry.

Witnesses with broad experience in the logging and the wire rope fitting industries testified that wire rope articles used in logging have distinctive characteristics. Because the fittings are used to haul heavy logs, they are constructed of a very high strength alloy and are generally stronger than fittings used in other industries. Unlike other fittings, logging fittings are also designed to be stronger than the rope with which they can be used, so that the rope will break prior to the point at which the fitting breaks. They have distinctive descriptions unique to the logging industry (i.e., bantam, light, standard, etc.), which indicate what size wire rope can be used with the fitting. They are purchased and used for logging.

In contrast, the fittings used in other industries are made of cheaper materials, and normally are described on the basis of their "safe working load," that is, the tonnage they can safely carry overhead. Without such safety markings, logging fittings are not safe to use in those industries where the fittings are used to carry objects overhead. It is also not commercially practicable to use other fittings for logging.

In short, the evidence indicates that the logging fittings are not interchangeable with fittings used in other industries; their sole function is for hauling timber after it is cut. Accordingly, they constitute a separate class—wire rope fittings used chiefly for timber harvesting on tree farms and forest lands managed under similar scientific principles.

### IV.

Finally, the government argues that because item 666.00 covers only agricultural implements "not specially provided for" elsewhere in the Tariff Schedules, it is inapplicable to the fittings here involved because they come within the classification of "articles of iron or steel" under item 657.20.

However, headnote 10(c) states that if an article is described in two or more classifications, it is "classifiable in the provision which most specifically describes it . . . ."

We have held that these wire fittings are agricultural implements. That is a more specific description than iron or steel articles. Item 666.00 "excepts only items *specially* provided for elsewhere, and item [657.20] is not sufficiently specific to 'specially provide' for the articles it contains."

*United States v. Miracle Exclusives, Inc.,* 668 F.2d 498, 501 (Cust. & Pat.App.1981) (emphasis in original), and cases there cited.

The judgment of the Court of International Trade is affirmed.

AFFIRMED.