EASTALCO ALUMINUM COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES,
Defendant–Appellee.

No. 90–1130.

United States Court of Appeals,
Federal Circuit.

Oct. 18, 1990.

John M. Peterson, Neville, Peterson & Williams, of New York City, argued for plaintiff-appellant.

Saul Davis, Commercial Litigation Branch, Dept. of Justice, of New York City, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office.

Before MARKEY, LOURIE, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Eastalco Aluminum Company ("Eastalco") appeals the judgment of the U.S. Court of International Trade holding that certain carbon blocks imported in 1981 "must be classified under item 517.91 as articles of carbon or graphite, a general category" within the Tariff Schedules of the United States (1981) ("TSUS"). *Eastalco Aluminum Co. v. United States*, 726 F.Supp. 1342, 1343 (Ct.Int'l Trade 1989). We affirm.

## I

The articles at issue are blocks used to line an aluminum reduction cell that produces aluminum metal by electrolysis of fused aluminum oxide salts contained in molten electrolyte baths. The blocks are made from anthracite coal extracted from La Mure mine in France. The coal is heated, mixed with coal tar pitch, shaped into blocks, and heated again, prior to importation. Initially, the U.S. Customs Service had classified the blocks as "electrodes," but that determination was reversed in an earlier Court of International Trade opinion because a major portion of the function of the blocks was to provide a heat insulating capability. *Eastalco Aluminum Co. v. United States*, No. 83-1-00095 (Ct.Int'l Trade Sept. 23, 1986). On remand, the Customs Service classified the blocks as carbon and graphite articles and that determination was affirmed by the Court of International Trade. On appeal here, Eastalco asserts that the blocks should be classified as "other" refractory bricks under item 531.27 of the TSUS.

## II

The Customs Simplification Act of 1954, Pub.L. No. 768, ch. 1213, § 101, 68 Stat. 1136, 1136 (1954), directed the Tariff Commission to make a comprehensive study of U.S. laws prescribing the tariff status of imported articles. Pursuant to that Act, the Tariff Commission prepared the TSUS and an accompanying report, the Tariff Classification Study (1960) ("*TCS*"). The TSUS was enacted into law verbatim by the Tariff Classification Act of 1962, Pub.L. No. 87–456, 76 Stat. 72 (1962), *repealed by* Harmonized Tariff Schedule of 1988, Pub.L. No. 100–418, 102 Stat. 1148 (codified at 19 U.S.C. § 1202 (1988)). Refractory bricks were classified under Schedule 5 ("Nonmetallic minerals and related products"), Part 2 ("Ceramic Products") of the TSUS. In order to be classified as refractory brick, as contended by Eastalco, an article had to meet the definition of "ceramic article" found at headnote 2(a) of Schedule 5, Part 2, of the TSUS (1981). Headnote 2(a) reads:

> a *"ceramic article"* is a shaped article having a glazed or unglazed body of crystalline or substantially crystalline structure, which body is composed essentially of inorganic nonmetallic substances and either is formed from a molten mass which solidifies on cooling, or is formed and subsequently hardened by such heat treatment that the body, if reheated to pyrometric cone 020, would not become more dense, harder, or less porous, but does not include any glass article....

19 U.S.C. § 1202, Schedule 5, Part 2 headnote 2(a) (1976).

In explaining the definition of ceramic article found in the TSUS, the *TCS* stated in relevant part:

> The term "ceramic article", as used and defined in schedule 5, has a meaning differing only slightly from the classical definition of the word.... Because of changing technology, however, many ceramic products are made without clay, for example pure oxide articles, devitrified glass articles, and some cermets.
>
> ....
>
> The definition of "ceramic articles" specifically excludes any glass article from its scope. The primary distinction between the ceramic articles of part 2 and glass articles of part 3 is that glass is essentially noncrystalline in structure whereas ceramic ware is essentially crystalline. It is true, of course, that opalescent glass does have small quantities of finely divided crystals but they are not

present in sufficient amount to present any serious problem. Ceramic articles have a body which is substantially crystalline. A recent development in the ceramic field concerns devitrified glass articles presently made by patent process and sold under the trade name "Pyroceram". This product is essentially crystalline in structure, but it is formed by a glass-making process. .

*TCS,* Schedules 5–6 at 77–78 (1960).

The parties agree that the blocks in question satisfy the requirements of headnote 2(a) in all respects but one: whether they are of "substantially crystalline structure." If so, the blocks are entitled to entry as refractory bricks. If not, they are to be classified as articles of carbon or graphite.

### III

At trial, experts of both parties testified as to whether the blocks were "substantially crystalline" within the meaning of headnote 2(a). The contradictory testimony was based on X-ray diffraction peaks, thermal history, and measurements of intermolecular d-spaces. The trial judge found the expert witnesses equally credible, and ruled their conflicting testimony to be in equipoise on the issue of whether the blocks were substantially crystalline. Eastalco's expert testified that he considered the blocks to be fifty percent or more crystalline. He opined that "fifty percent crystalline or greater would be considered substantially crystalline." The Government's expert indicated his view that the blocks were less than fifty percent crystalline. Neither expert, however, had quantified by test the amount of crystallinity in the blocks.

The testimony revealed that quantitative testing could be performed to measure the crystalline content of the blocks. A mutually acceptable protocol for such quantitative testing was established. The results of the tests, which neither party contests, indicated a crystalline content of 5% for the blocks, more or less 1%. The Court of International Trade held that the results of the agreed test undercut the strength of Eastalco's expert's view and provided dis-

positive support for the opinion of the government's expert that the blocks were not substantially crystalline, and therefore could not be classified as refractory brick.

### IV

Eastalco contends that the court erred, as a matter of law, in construing the words "substantially crystalline" in the TSUS to refer to a quantitative crystalline content and to require the presence of a substantial percentage of crystalline content in order to be deemed ceramic. Eastalco maintains to the contrary that the statutory meaning of "ceramic" is plainly established by the other parameters of the statute, namely the thermal history, heat testing and hardening characteristics, and that the "substantial crystallinity" words in headnote 2(a) only require that the blocks have acquired some crystalline carbon ordering. Furthermore, Eastalco contends that rather than using volume fractions of crystalline content, the statutory criterion is fulfilled by measuring the intermolecular d-spacing as a dependable indicator of the degree of crystallization.

### V

Statutory interpretation is a question of law. *Hasbro Ind. v. United States,* 879 F.2d 838, 840 (Fed.Cir.1989). The statute requires that an article be "substantially crystalline" to be classified as a ceramic article. The plain meaning of that term, however, is not apparent from the face of the statute. The legislative history of the statute is sparse, and refers us to the Tariff Commission's submitted report. S.Rep. No. 1317, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong.Adm.News 1641, 1642. The formal report, the *TCS,* has been recognized as a part of the legislative history. *Nippon Kogaku (USA), Inc. v. United States,* 673 F.2d 380, 383 (CCPA 1982). As noted above, the *TCS* addresses the difficulty of classifying recently-developed articles. In adopting the TSUS, Congress agreed with the *TCS* that the "classical definition" of ceramic articles should be expanded to include some non-traditional items. To accommodate that expansion,

Congress adopted the concept of a "substantially crystalline" limitation upon the definition of ceramic articles. In so limiting ceramic articles to items that were substantially crystalline, Congress excluded from "ceramic" entitlement some silica-derived substances, glass and opalescent glass, while including others, devitrified glass. Since the dividing line between these substances, as expressly stated in the legislative history, is whether they have "small quantities" or "sufficient amounts" of crystalline structure, the adverbial adjective, "substantially," was meant to impart a quantitative limitation. As a matter of statutory construction, we affirm the holding of the Court of International Trade that the test of whether a material is substantially crystalline is quantitative. Furthermore, the cited portions of the *TCS* indicate that the amount envisioned for a ceramic article was to exceed trivial percentages such as that found in opalescent glass.

Eastalco also argues that the intermolecular d-spacing data demonstrate the "essentially crystalline" nature of the blocks. Interspacing data may, in some instances, demonstrate that the molecular structure of an article is crystalline, especially when the average intermolecular spacing corresponds exactly to the known intermolecular spacing of a specific crystal. However, the fact that the intermolecular d-spaces of the blocks may be close to that of crystalline carbon (graphite) does not answer the required question of whether the blocks have a substantially crystalline structure within the meaning of headnote 2(a), especially in light of the crystalline content test results.

Finally, Eastalco contends that since the blocks satisfy the majority of the highly specific and technical requirements under item 531.27, they should not be classified under a general "basket," such as item 517.91, covering "[a]rticles not specially provided for, of carbon or graphite." "[I]f an article is described in two or more classifications, it is 'classifiable in the provision which most specifically describes it....'" *United States v. Border Brokerage Co.*, 706 F.2d 1579, 1583 (Fed.Cir.1983) (quoting 19 U.S.C. § 1202, General headnote 10(c) (1976)). However, here the blocks are not described by the more specific category so that the preference does not apply. "The classification of the Customs Service is presumed to be correct and the burden of proof is upon the party challenging its classification." *Simod America Corp. v. United States*, 872 F.2d 1572, 1576 (Fed. Cir.1989) (citing 28 U.S.C. § 2639(a)(1) (1988)). Conceding that the "basket" item describes the blocks, Eastalco has failed to demonstrate that the blocks are entitled to the more specific classification.

In light of the uncontested evidence that the blocks in question have at most a crystalline content of 6% and the admission by Eastalco's expert that this percentage of crystallinity is inconsistent with being labeled "substantially crystalline" in the trade, we cannot find that the court erred, as a matter of law, in finding Eastalco's blocks were not "ceramic articles." Since the blocks are not "ceramic articles," they cannot be classified under item 531.27. The judgment of the Court of International Trade is

AFFIRMED.